EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ginette Valencia Mercader; Rodolfo A. Catinchi y la Sociedad Legal de Gananciales por ellos compuesta<br><br>        Peticionarios<br><br><br>          v.<br><br><br>Ramón García García<br><br>        Recurrido<br><br>Maeve Anne Sandiford, Edmond Valencia Byrd, Connie Valencia Byrd<br><br>        Recurridos | Certiorari<br><br>2012 TSPR 172<br><br>187 DPR ____ |

Número del Caso: CC-2010-1002


Fecha: 8 de noviembre de 2012


Tribunal de Apelaciones:

        Región Judicial de San Juan


Abogados de la Parte Peticionaria:

        Lcdo. Efraín González Tejera
        Lcdo. Francisco G. Bruno
        Lcdo. Omar Oquendo Claudio
        Lcdo. Jorge R. Jiménez


Abogados de la Parte Recurrida:

        Lcdo. Donato Rivera de Jesús
        Lcda. Briseida Delgado Miranda
        Lcdo. Enrique Vélez Rodríguez
        Lcdo. Frank Dalmau Gómez
        Lcdo. Efraín Guzmán Mollet

Materia: Sucesiones – Partición de Herencia; bienes fuera de Puerto Rico; conflicto de leyes; descubrimiento de prueba

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ginette Valencia Mercader; Rodolfo A. Catinchi y la Sociedad Legal de Gananciales por ellos compuesta<br><br>Peticionarios<br><br>v.<br><br>Ramón García García<br><br>Recurrido<br><br>Maeve Anne Sandiford, Edmond Valencia Byrd, Connie Valencia Byrd<br><br>Recurridos | CC-2010-1002 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 8 de noviembre de 2012.

Nos corresponde resolver si en un proceso de partición de herencia los tribunales de Puerto Rico están facultados, conforme al Art. 10 de nuestro Código Civil, 31 L.P.R.A. sec. 10, a adjudicar el título de unos bienes que están ubicados fuera de su jurisdicción territorial. Evaluada la controversia, concluimos que en Puerto Rico el derecho sucesoral está ensimismado en la corriente germánica cuando se suscitan controversias de conflictos de leyes aplicables, conforme a las enmiendas realizadas al Código Civil en 1902. En vista de los principios que subyacen en esta vertiente, resolvemos que en derecho sucesoral los tribunales de Puerto Rico no ostentan jurisdicción para atender controversias acerca de la titularidad de bienes inmuebles sitos fuera de nuestra Isla.

Por último, determinamos que en este caso, sujeto al cumplimiento de las Reglas de Evidencia, procede que en el juicio se presente prueba de los actos realizados por los herederos previo al deceso del testador.

I

El Sr. Alfonso Valencia Jiménez falleció el 14 de marzo de 1994. Antes de su muerte, otorgó un testamento abierto en 1986 en que distribuyó la mayor parte de su patrimonio por porciones iguales entre sus dos hijos, Ginette Valencia Mercader y Wallace Valencia Mercader. En su testamento, el señor Valencia Jiménez designó a su hijo como el albacea y contador partidor de su caudal hereditario.

Al año siguiente del fallecimiento del señor Valencia Jiménez, los hermanos Valencia Mercader otorgaron una primera escritura de partición y adjudicación parcial de bienes hereditarios. Mediante esa escritura, hicieron la división y partición de algunos de los bienes de la herencia.

Posteriormente, la señora Valencia Mercader se percató de varias irregularidades que cometieron su hermano y el Lcdo. Ramón García García en la distribución de los bienes del caudal de su padre. Tras reclamarles, los hermanos Valencia Mercader suscribieron un acta aclaratoria en 1996, mediante la cual subsanaron varios errores cometidos en la primera escritura. Además, hicieron constar que faltaban por distribuir a cada uno de ellos, varios bienes del caudal hereditario. De igual forma, confirmaron que la

señora Valencia Mercader no conocía la totalidad de las propiedades y obligaciones del caudal de su padre. Constataron, además, que la señora Valencia Mercader no podía aceptar las cuentas del caudal porque no eran finales, ni podía relevar a su hermano de toda responsabilidad en el ejercicio de su cargo como albacea y contador partidor hasta tanto se perfeccionara el cuaderno particional.

Sin embargo, antes de que finalizaran los trámites de la partición del caudal del señor Valencia Jiménez, el señor Valencia Mercader falleció. A este le sobrevivieron su esposa, la Sra. Maeve Anne Sandiford  y sus dos hijos, la Sra. Mary Constance Valencia Byrd y el Sr. Edmond Valencia Byrd.

Luego de la muerte de su hermano, la señora Valencia Mercader suscribió una carta a la viuda de su hermano. En esta le enfatizó la necesidad de aclarar y terminar los asuntos relacionados a la partición de la herencia de su padre antes de que ellos realizaran la partición de la sucesión de su hermano. A pesar de lo solicitado, la sucesión del señor Valencia Mercader firmó en 1999 una escritura de partición parcial, sin haberse finalizado la partición total de la sucesión del señor Valencia Jiménez.

Tras varios intentos extrajudiciales para que se realizara la partición final del caudal del señor Valencia Jiménez, el 13 de agosto de 2001 la señora Valencia Mercader y su esposo, el Sr. Rodolfo A. Catinchi,

presentaron ante el Tribunal de Primera Instancia una demanda en daños y perjuicios y sobre partición final de herencia contra la señora Anne Sandiford, los hermanos Valencia-Byrd y el licenciado García García. Los hijos del señor Valencia Mercader no fueron incluidos hasta la presentación de la segunda demanda enmendada.

En esencia, alegaron que el señor Valencia Mercader efectuó negligentemente sus gestiones como albacea de la herencia de su padre. Asimismo, arguyeron que el señor Valencia Mercader y el licenciado García García, quien fue contratado por el primero para que lo asesorara en todo lo relacionado a la sucesión, hacían gestiones en secreto y de forma confidencial, y solo en ocasiones brindaban información sobre ellas a la señora Valencia Mercader. Adujeron, a su vez, que el señor Valencia Mercader no realizó de forma correcta y completa el inventario, liquidación, distribución y partición final de la herencia. En particular, denunciaron que a raíz de unas investigaciones realizadas advinieron en conocimiento de que en el inventario del caudal relicto se omitieron bienes por distribuirse de la herencia de la sucesión del señor Valencia Jiménez. Igualmente, alegaron que obtuvieron información que demostraba violaciones y valoraciones incorrectas de las particiones, y adjudicaciones parciales de los bienes en perjuicio de la señora Valencia Mercader como heredera. Por último, señalaron que supuestamente la señora Anne Sandiford hizo caso omiso a los reclamos para

que la partición de la herencia del señor Valencia Jiménez se concluyera antes de proceder con la distribución del caudal de la herencia de su hermano.

Posteriormente, la señora Anne Sandiford reconvino. En síntesis, manifestó que a su juicio, la señora Valencia Mercader incumplió con su deber de distribuir los bienes inmuebles del caudal de su padre ubicados en la República Dominicana. Asimismo, alegó que su incumplimiento ha hecho que el caudal del señor Valencia Mercader incurra en costos contributivos sustanciales por supuestamente no informarlo a las autoridades fiscales correspondientes. Finalmente, alegó que la señora Valencia Mercader recibió unos bienes ubicados en Bayamón y en Cupey en exceso de su participación.

Tras varios trámites procesales, el 30 de junio de 2008 la señora Valencia Mercader presentó una "Petición de orden relativa a bienes pendientes por distribuir". Apéndice del recurso, pág. 180. En esta recalcó que no se habían distribuido varios bienes del caudal hereditario de su padre. Nuevamente, alegó las gestiones infructuosas que realizó con la viuda de su hermano y sus sobrinos para completar la partición final del caudal de su padre. En cuanto a los bienes sitos en la República Dominicana, señaló que viajó a la isla vecina y constató que su padre era el alegado titular de unos terrenos en el sector Haina y de otro solar localizado en la provincia de Samaná. Arguyó, además, que tanto la señora Anne Sandiford, como

los hermanos Valencia Byrd, han manifestado falta de interés e inacción con relación a las tierras que se encuentran en la República Dominicana.

Luego del intercambio de varias mociones, el Tribunal de Primera Instancia dictó una orden en la que dispuso que conforme al Art. 10 del Código Civil, supra, todos los trámites legales y remedios concernientes a los bienes inmuebles ubicados fuera de la Isla, debían llevarse a cabo y solicitarse en la nación donde estén ubicados. A esos escritos le sucedió una sentencia parcial que dictó el Tribunal de Primera Instancia el 7 de enero de 2009. En ella, el foro primario declaró con lugar la desestimación de la reconvención que presentaron la señora Anne Sandiford y los hermanos Valencia-Byrd. Cónsono con su dictamen anterior, desestimó toda causa de acción incluida en la reconvención que se refiriera, se relacionara o resultara de las actuaciones de la señora Valencia Mercader sobre los alegados bienes inmuebles pertenecientes al caudal de su padre sitos fuera de nuestra jurisdicción.

Pasado otro intercambio de mociones, el Tribunal de Primera Instancia enmendó esa sentencia en dos ocasiones más. En la última, de 3 de marzo de 2009, desestimó toda causa de acción contenida en la demanda, en la demanda enmendada y en la reconvención que se relacionara con las actuaciones de la señora Valencia Mercader sobre los alegados bienes inmuebles pertenecientes al caudal de su padre sitos fuera de la Isla.

Por otra parte, durante el inicio del descubrimiento de prueba se suscitaron otro sinnúmero de incidentes procesales. Entre estos, estuvo la solicitud de la señora Valencia Mercader al tribunal para que se expidieran citaciones dirigidas a varias instituciones financieras en las que su padre, hermano y cuñada tenían bienes. El Tribunal de Primera Instancia ordenó las citaciones, pero posteriormente paralizó aquellas dirigidas a las cuentas bancarias de la señora Anne Sandiford. A su vez, requirió a la señora Valencia Mercader que expusiera la pertinencia de los documentos solicitados. En su comparecencia, esta explicó que la falta de transparencia en el proceder de la señora Anne Sandiford y de sus sobrinos ameritaba realizar un descubrimiento de prueba sobre los bienes recibidos entre el 1991 y el 2004, es decir desde varios meses después de enfermarse el señor Valencia Jiménez y hasta varios meses después de fallecer. Atribuyó su necesidad al fin legítimo de determinar el paradero de los bienes que no fueron distribuidos o tomados en consideración al momento de valorar el caudal hereditario de su padre. La señora Anne Sandiford se opuso a ese descubrimiento por entender que resultaba irrelevante para determinar los eventos ocurridos antes de la muerte del señor Valencia Jiménez.

En respuesta, el Tribunal de Primera Instancia concedió un término a la señora Valencia Mercader para que acreditara la pertinencia de pedir los estados de cuenta de la señora Anne Sandiford correspondientes a fechas

anteriores a la muerte del señor Valencia Jiménez. Asimismo, dispuso que los bienes muebles e inmuebles pertenecientes a las corporaciones no serían objeto de adjudicación en este caso por no formar parte del caudal hereditario. Sin embargo, dispuso que el descubrimiento de prueba sobre dichos bienes sí era pertinente a los efectos de determinar la existencia de dividendos y el valor de las acciones corporativas que forman parte del caudal.

Acontecido otro intercambio de mociones, el Tribunal de Primera Instancia emitió una nueva resolución y orden. En lo pertinente, dispuso:

> Por otro lado, entendemos que la información requerida de la Sra. Maeve Anne Sandiford, es pertinente, particularmente en atención al Contrato de Compra venta de acciones suscrito por el Sr. Wallace Valencia y ella el 15 de abril de 1992, en un pleito donde se impugne la validez de dicho contrato y se solicite se decrete la nulidad de las actuaciones de Wallace Valencia y Maeve Anne Sandiford, tomando en consideración que al efectuarse dichas transacciones el Sr. Alfonso Valencia estaba vivo.
>
> **Sin embargo, el caso ante nuestra consideración es uno sobre complemento de herencia por alegada lesión y daños y perjuicios y no uno de reivindicación de bienes, por alegadas actuaciones fraudulentas de los accionistas u oficiales de las corporaciones. Por la propia naturaleza de la acción sucesoral radicada, el Tribunal, al momento de adjudicar, solamente puede tomar en consideración el caudal existente al momento del fallecimiento de Don Alfonso Valencia.**
>
> **Cualquier controversia o reclamación sobre las actuaciones de accionistas u oficiales de las**

corporaciones deberá presentarse en el pleito corporativo correspondiente.

Por lo tanto, limitamos el descubrimiento de prueba sobre las cuentas de la Sra. Maeve Anne Sandiford al periodo que comienza a raíz del fallecimiento de Don Alfonso Valencia. Someta al Tribunal la parte demandante en 10 días nuevos proyectos de Orden de producción de documentos sobre las cuentas de Maeve Anne Sandiford, conforme los parámetros aquí señalados.

Hacemos extensiva esta Resolución al descubrimiento de prueba en su totalidad incluyendo las órdenes ya expedidas.

Añadimos que el Tribunal no permitirá el desfile de prueba durante el Juicio sobre transacciones o eventos ocurridos antes del fallecimiento del Sr. Alfonso Valencia.
…
Por otro lado, enfatizamos una vez más que el presente litigio ante nuestra consideración es uno de complemento de herencia por alegada lesión y daños y perjuicios.

La posible acción de restitución de acciones contra la entidad o entidades corporativas que emitieron las acciones, debe radicarse y ventilarse en un pleito corporativo independiente. La partición y liquidación final del caudal dejado por el Sr. Alfonso Valencia se limitará a los bienes muebles e inmuebles existentes (éstos últimos ubicados en el Estado Libre Asociado de Puerto Rico) propiedad del Sr. Alfonso Valencia, <u>al momento y no antes de su fallecimiento</u>.

… (Énfasis en el original.)

Resolución de 10 de septiembre de 2009, <u>Apéndice del recurso</u>, págs. 1432-1435.

Insatisfechos con esa determinación, el matrimonio Valencia-Catinchi presentó una moción de reconsideración que el tribunal acogió. Tras otro intercambio de mociones, reiteró su dictamen y denegó a la parte demandante

descubrir y presentar prueba en el juicio sobre eventos o transacciones anteriores al fallecimiento del señor Valencia Jiménez. De la misma forma, determinó que "[l]as alegaciones de sustracción fraudulenta de bienes corporativos no son equivalentes a alegaciones (que no se han presentado en este caso) de donaciones hechas por el Sr. Valencia en vida, sujetas a colación". Resolución de 10 de septiembre de 2009, Apéndice del recurso, pág. 1784.

El tribunal señaló que las partes estaban de acuerdo en que los derechos hereditarios recaían sobre la totalidad del caudal hereditario. Por consiguiente, si en su día se probara que los inmuebles sitos en la República Dominicana pertenecían al señor Valencia Jiménez, el Tribunal de Primera Instancia tendría la potestad de incluirlos como parte del caudal. Ahora bien, amparándose en el Art. 10 del Código Civil, supra, y en Bracons v. Registrador, 24 D.P.R. 753 (1917), el tribunal reiteró que "la adjudicación de dichos derechos y la liquidación de los bienes inmuebles sitos en el extranjero deben ser efectuadas en el Tribunal del país donde se encuentran situados". Íd.

Insatisfechos una vez más, los esposos Valencia-Catinchi presentaron un recurso de *certiorari* ante el Tribunal de Apelaciones. En esencia, establecieron que erró el foro primario al impedirles descubrir y presentar prueba sobre la reducción del patrimonio del señor Valencia Jiménez previo a su deceso, producto de los actos del señor Valencia Mercader y los demás codemandados. Sostuvieron, además, que

el señor Valencia Mercader obtuvo un adelanto de su herencia al beneficiarse económicamente de dichos actos. Así, argumentaron que aplica la doctrina de colación y, por lo tanto, procede adjudicar al señor Valencia Mercader el valor de los bienes alegadamente sustraídos del caudal hereditario antes del fallecimiento de su padre como adelanto de su herencia.

Como segundo error, indicaron que el Tribunal de Primera Instancia falló al resolver que la liquidación, partición y adjudicación de los alegados bienes inmuebles del caudal del señor Valencia Jiménez sitos en la República Dominicana tiene que hacerse por un tribunal del país vecino y no por nuestros tribunales. Indicaron que una vez se determine que el señor Valencia Jiménez era el dueño de esos inmuebles, procedía que el Tribunal de Primera Instancia resolviera que forman parte de la masa universal hereditaria y haga la debida partición y adjudicación final entre sus herederos.

El Tribunal de Apelaciones modificó la resolución y orden del foro primario. De esta forma, permitió un descubrimiento de prueba que "fuera amplio y liberal de todos los asuntos que puedan tener cualquier relación posible con la materia que es objeto del pleito, aunque no estén relacionados con las controversias específicas que fueron indicadas en las alegaciones". Sentencia del Tribunal de Apelaciones, pág. 23, Apéndice del recurso, pág. 1955. Sobre los bienes inmuebles ubicados en la República

Dominicana, indicó que conforme al Art. 10 del Código Civil, supra, y lo resuelto por esta Curia en Hecht v. Hecht, 12 D.P.R. 227 (1907), el Tribunal de Primera Instancia no erró al resolver que no realizaría la adjudicación ni la liquidación de estos bienes. Concluyó que eso le corresponde a un tribunal del país donde estén localizados los inmuebles.

Inconformes otra vez, el matrimonio Valencia-Catinchi recurre ante nos. Como primer señalamiento de error, imputan error al foro apelativo intermedio por confirmar que la liquidación, partición y adjudicación de los bienes inmuebles del caudal relicto del señor Valencia Jiménez sitos en la República Dominicana tiene que hacerle un tribunal de ese país y no el Tribunal de Primera Instancia. Como segundo error, alegan que incidió el Tribunal de Apelaciones al no revocar aquella parte de la resolución y orden del Tribunal de Primera Instancia que impedía el desfile de prueba sobre transacciones o eventos ocurridos antes del fallecimiento del señor Valencia Jiménez. Aducen que el Tribunal de Apelaciones "abre una puerta al descubrimiento, pero mantiene cerrada la puerta a la evidencia que se obtenga mediante tal descubrimiento". Petición de *certiorari* de la parte peticionaria, pág. 18.

El 8 de abril de 2011 expedimos el auto. En cumplimiento con nuestra orden, las partes presentaron sus respectivos alegatos. Con el beneficio de ambos, procedemos a resolver.

II

En su alegato ante este Tribunal, el matrimonio Valencia-Catinchi arguye que conforme a lo que resolvimos hace más de 100 años en Hecht v. Hecht, 12 D.P.R. 227 (1907),

> no debe quedar duda de que la herencia de don Alfonso constituye una sola masa hereditaria, independientemente de donde estén sitos los bienes que la integran o de su naturaleza real o personal. Tampoco debe nadie dudar que, a los fines particionales, la herencia no debe segmentarse, es decir, fragmentarse entre diversos foros judiciales.
>
> Solicitud de Certiorari, págs. 12-13.

Hace poco más de dos años tuvimos la oportunidad de definir el derecho internacional privado en Ramírez Sainz v. S.L.G. Cabanillas, 177 D.P.R. 1, 11 (2009). Allí, expresamos que

> [e]l derecho internacional privado es la disciplina que estudia y explica las leyes que aplican a una controversia entre personas de ciudadanía o domicilio diferente, o, en general, a casos vinculados a más de un estado y determina cuál foro judicial debe resolver esos casos. También establece el procedimiento para reconocer un acto realizado en un territorio con jurisdicción separada o una sentencia dictada por un tribunal extranjero. (Citas omitidas.)

El derecho internacional privado, al igual que muchas otras ramas jurídicas, se extiende hacia otras áreas del derecho. Por esa razón, nunca encontraremos una definición única, pues carece de unos contornos perfectamente delimitados, "de nociones precisas, de límites exactos, en una palabra[,] de verdades definitivas". Diego Guzmán

Latorre, Tratado de Derecho Internacional Privado, Editorial Jurídica de Chile, 3ra ed., 1997, Santiago de Chile, citando a A. Miaja de la Muela, Derecho Internacional Privado, Ediciones Atlas, Madrid, España, tomo I, pág. 9. Por ejemplo, para Brocher, el derecho internacional privado "debe prevenir o resolver de un modo conveniente los conflictos que puedan surgir entre las legislaciones que emanan de diferentes soberanías". D. Guzmán Latorre & M. Millán Simpfendörfer, Curso de Derecho Internacional Privado, Editorial Jurídica de Chile, Santiago de Chile, pág. 15. Por su parte, Carlos Esplugues Mota, lo define como la rama del derecho que atiende

> la regulación de las relaciones y situaciones privadas de carácter internacional generada entre particulares, o sujetos que no siéndolo actúen como tales. Su finalidad es aportar una respuesta adecuada y justa a los problemas a que ellos se ven expuestos como consecuencia de la existencia de una pluralidad de ordenamientos independientes que al parecer vinculados a una concreta relación o situación jurídica resultan potencialmente reguladores de la misma.
>
> C. Esplugues & J.L. Iglesias Buhigues, Derecho Internacional Privado, Editorial Tirant lo Blanch, Valencia, España, 2008, págs. 29-30.

Véase, además, J.E. Dávila Rivera, Interacción entre el Derecho Internacional Privado y el Derecho de Sucesiones, 44 Rev. Jur. U. Inter. P.R. 1, 4 (2011).

Por último, para el chileno Diego Guzmán Latorre

> el Derecho Internacional Privado es la rama del derecho internacional de cada

país que tiene por objeto fijar la nacionalidad de los individuos, determinar los derechos de que gozan los extranjeros, resolver los conflictos de leyes referentes al nacimiento, a la modificación, a la transformación o a la extinción de los derechos adquiridos y resolver, por último, los conflictos de jurisdicción que puedan surgir entre estados independientes o entre Estados componentes de un Estado Federal.

Guzmán Latorre & Millán Simpfendörfer, Curso de Derecho Internacional Privado, pág. 17.

El mundo globalizado en que vivimos ha hecho que "Puerto Rico dej[ara] de ser hace mucho tiempo una comunidad provincial que vivía de espaldas a los intercambios internacionales, al turismo, a la emigración, en fin, a la dimensión mundial de los negocios". E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, 59 Rev. Jur. U.P.R. 557 (1990). El derecho internacional se ha asentado

como la disciplina que reglamenta la convivencia entre los pueblos, en una amplia dimensión. … La razón para esta evolución es sencilla. El estado como institución, como organismo, se ha quedado pequeño. El desborde de su jurisdicción se hace inminente, producto entre otras razones de los adelantos tecnológicos y de la explosión poblacional.

R. Aponte Toro, El Derecho Internacional en la educación del jurista puertorriqueño 60 Rev. Jur. U.P.R. 81, 82 (1991).

Por eso, "en la actualidad resulta común que personas extranjeras, domiciliadas o no en Puerto Rico, hagan

inversiones en la Isla que pueden conllevar la adquisición de bienes inmuebles, de bienes muebles o de ambos". Íd. De la misma forma, es común que puertorriqueños adquieran bienes muebles e inmuebles en países extranjeros o en otras jurisdicciones de los Estados Unidos. Como consecuencia de lo anterior, son múltiples las controversias jurídicas que se pueden suscitar cuando fallece una persona que adquirió bienes en distintas jurisdicciones. J.E. Dávila Rivera, supra, pág. 2. Así pues, es certera la afirmación del profesor Pierre Lalive de que "no siempre es suficiente atravesar la frontera para escapar al [sic] efecto de las leyes de [un] país o para beneficiarse con las facilidades ofrecidas, sobre tal o cual punto, por una ley extranjera". Antonio Boggiano, Derecho Internacional Privado, 2da. ed., Ediciones Depalma, Buenos Aires, Argentina, 1983, pág. 1, citando a Pierre Lalive, Tendances et méthodes en droit international privé (Cours general), "Recueil des Cours de l´Academie de Droit International de La Haye", 1977-II-155, pág. 15.

La profesora Enid Martínez Moya explica que "[l]os estatutos que pretenden resolver los conflictos de leyes en el ámbito del Derecho Sucesoral pertenecen a uno de dos sistemas: el romano o el germánico". Martínez Moya, supra, págs. 559-560. Ante esa realidad, surge la necesidad de analizar la letra de nuestro ordenamiento jurídico sobre derecho internacional privado en el campo del derecho sucesoral para conocer si es el sistema romano o el

germánico el que regirá las sucesiones cuando el causante deja bienes en la Isla y en otra jurisdicción.

Como es sabido, "[e]n la actualidad, los problemas que se generan en nuestra jurisdicción en materia de derecho internacional privado son atendidos por los Arts. 9 (estatuto personal), 31 L.P.R.A. sec. 9, el Art. 10 (estatuto real) y el Art. 11 (estatuto formal) del Código Civil de Puerto Rico", 31 L.P.R.A. secs. 9, 10 y 11. Roselló Puig v. Rodríguez Cruz, 183 D.P.R. 81, 98 (2011). Específicamente, si de bienes se trata, el Art. 10 del Código Civil, supra, es el que rige la controversia. Claro, ello está sujeto a las excepciones establecidas en el Art. 11 del Código Civil de Puerto Rico, supra. Estas limitan las actuaciones que se realizan fuera de Puerto Rico si estas están vedadas por nuestras leyes, o contravienen el orden público.

Por regla general, se espera que el estatuto sucesoral refleje la visión que el ordenamiento interno de un país tiene sobre la sucesión. Martínez Moya, supra, pág. 560. "Se trata, pues, de dos niveles -el internacional y el interno- en cada uno de los cuales se manifiesta una noción específica del significado y alcance de la sucesión". Íd. Por consiguiente, se espera que el nivel interno e internacional coincidan, de manera "que un ordenamiento que tenga la visión romana de lo que es la sucesión adopte un estatuto de conflicto de leyes que responda precisamente a esa concepción". Íd. Sin embargo, en Puerto Rico no ocurre

así. Si observamos la definición de la herencia que nos brinda el Art. 608 del Código Civil, 31 L.P.R.A. sec. 2090,[1] notaremos que nuestro ordenamiento sucesoral interno preceptúa la sucesión conforme al modelo romano. Sin embargo, el Art. 10 del Código Civil, supra, que es el que atiende los conflictos que se generan en el campo del derecho internacional privado cuando de bienes muebles e inmuebles se trata, es de corte germánico. Íd.

Con el propósito de entender mejor ambos sistemas, analicemos algunas de sus características más sobresalientes.

### III

**A-Tradición Romana**

Los países que en sus estatutos sobre derecho internacional privado siguen la tradición romana, "visuali[zan] la herencia como una unidad ideal, como una universalidad jurídica cualesquiera que sean la naturaleza de los bienes que la constituyen y los países en que estén situados; y considerando todos los bienes como si formasen una sola masa patrimonial". Martínez Moya, supra, pág. 561, citando a V.P. Fiore, Derecho Internacional Privado o principios para resolver los conflictos entre las leyes de los diversos estados, Madrid, 1993, pág. 70. De ahí, que

---

[1] "Sec. 2090. **Definición de Herencia**

La herencia comprende todos los bienes, derechos y obligaciones de una persona, que no se extingan por su muerte".

"constituyendo la sucesión la continuación de la persona del difunto, debe ella regirse por la ley personal del causante". Guzmán Latorre y Millán Simpfendörfer, Curso de Derecho Internacional Privado, pág. 824. Para algunos sistemas será "la nacionalidad del causante antes de morir y para otros; … su último domicilio". Martínez Moya, supra, pág. 562. Observemos que, bajo este sistema, se concibe la sucesión "como una universalidad que comprende la totalidad del patrimonio del causante". Íd. Al clasificarse como tal,

> es un objeto ideal, y, en ese sentido, la lógica conduce forzosamente a aplicar una sola ley a lo que por su naturaleza es una unidad, a lo que no puede destruirse sin destruir esa unidad, y respecto de la cual no cabe, por tanto, considerar aisladamente cada uno de los elementos que la componen.
>
> Íd.

En síntesis, bajo el sistema romano, a la universalidad compuesta por todos los bienes del causante le aplica una sola ley. Al ser así, no pueden considerarse aisladamente cada uno de los bienes que componen la herencia porque al hacerlo, inevitablemente se destruye la unidad de la que está compuesta. Por ello, cuando ese es el sistema que rige en un país

> un tribunal que tenga que dirimir una controversia de índole sucesoral en situaciones en que un ciudadano o domiciliado de otra nación haya dejado bienes, del tipo que sea, en el territorio sujeto a su jurisdicción, tendrá que considerarlos, conjuntamente con los ubicados en otros lugares, como una masa única e ideal a la que habrá de aplicar una sola ley que podría ser, según sea el caso, la ley sucesoral de

la nación del causante o la de su domicilio.

Íd., pág. 563.

**B-Tradición Germánica**

El sistema germánico, contrario al romano, concibe "la herencia como un fenómeno de atribución de un patrimonio de bienes, que lleva implícita no la unidad sucesoria sino la pluralidad de masas hereditarias". Íd., pág. 564, citando a M. Aguilar Navarro, Derecho Civil Internacional, Madrid, 1973, pág. 527-529. "Los regímenes cuyos ordenamientos internos siguen esta tendencia ven en la sucesión no la sustitución de la persona del causante, sino la atribución de la titularidad sobre un patrimonio dentro de un proceso dinámico cuyo objeto y centro de gravedad lo forman los bienes". Íd., pág. 564, citando a J.D. González Campos, Derecho Internacional Privado, Oviedo, 1984, pág. 241. Por consiguiente, cuando los bienes que dejó el causante estén situados en distintas jurisdicciones, procede que "el patrimonio del causante qued[a] dividido en tantas masas sucesorias como leyes [diferentes e] independientes entre sí aunque proced[a]n del mismo titular". Íd., citando a M. Aguilar Navarro, Derecho Civil Internacional, Madrid, 1975, pág. 732.

En los países en que impera la corriente germánica, existen dos normas que regulan los problemas de derecho internacional privado. Íd. La primera de ellas se caracteriza por aplicar la *lex situs* a todos los bienes independientemente de su naturaleza mueble o inmueble. La

segunda, aplica únicamente la *lex situs* a los inmuebles, y la de la nacionalidad del causante o la de su domicilio a los bienes muebles. Íd.

Como vemos, la corriente germánica "produce una pluralidad de sucesiones cuando los bienes están situados en diversos países". Guzmán Latorre & Millán Simpfendörfer, Curso de Derecho Internacional Privado, pág. 824. Esto significa que cada sucesión se rige por una ley distinta que dependerá del lugar donde estén sitos los bienes. Martínez Moya, supra, pág. 564. Como consecuencia, la legítima de los herederos se computará "según el ordenamiento que rija en el Estado donde están localizados los bienes haciéndose total abstracción de los bienes dejados en otra parte". Íd.

La comunidad internacional ha manifestado "un mayor endoso" al sistema romano-unitario. Martínez Moya, supra, pág. 565. Esto responde a que esa regla "presenta la enorme ventaja de conservar la unidad de la sucesión". Guzmán Latorre & Millán Simpfendörfer, op cit., pág. 824. Por eso, la profesora Martínez Moya entiende "que nuestro Código pide a gritos una reforma, como resultado de la cual debe adoptarse un estatuto que incorpore el sistema romano universalista que es el que está a tono con nuestra percepción del fenómeno sucesoral". E. Martínez Moya, Sumario: El Derecho Sucesorio Puertorriqueño, 67 Rev. Jur. U.P.R. 1, 88 (1998). Propone que "[e]l caudal hereditario [se vea] como una masa única, independientemente de la

naturaleza mueble o inmueble de los bienes y del lugar de su ubicación, a lo que tendrá que aplicársele una sola ley que podría ser la de la nacionalidad o la del domicilio del causante". Íd. Claro está, reconoce que es la Asamblea Legislativa la que tiene la última palabra. Íd. Así reconoce que estemos o no de acuerdo, nuestro estatuto sucesoral de conflicto de leyes pertenece a la corriente germánica fragmentarista. Por ello, cuando muere una persona domiciliada en el exterior se entenderá que el caudal queda dividido en varias masas de bienes dependiendo de los distintos lugares en los que hayan inmuebles. E. Martínez Moya, Cabrer v. Registrador: un problema sucesoral de conflicto de leyes, op cit., pág. 594. Cada una de esas masas estaría controlada por la *lex situs*". Íd. Sin embargo, la profesora Martínez Moya no analizó cómo armonizar la regla romano-unitaria con los conflictos que surgen en un sistema federal de jurisdicciones independientes entre sí, como el que vivimos.

Por su parte, los favorecedores del sistema germánico entienden que esta corriente garantiza el respeto a la soberanía nacional al impedir que bienes localizados en un país sean regidos por una legislación extranjera. Además, afirman que resulta en una defensa del orden público de cada país.

Con este resumen de las características de ambos sistemas, pasemos a analizar el historial legislativo que subyace al Art. 10 del Código Civil, supra.

IV

En nuestra jurisdicción, el Art. 10 del Código Civil, supra, dispone que "[l]os **bienes muebles** están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos". Roselló Puig v. Rodríguez Cruz, supra, pág. 91 n. 11. Véase, además, Sucesión Evans v. Secretario de Hacienda, 108 D.P.R. 713 (1979).

Antes de las reformas al Código Civil en 1902, nuestro Art. 10, supra, leía como sigue:

> Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles a las leyes del país donde están sitos. Sin embargo, las sucesiones legítimas y las testamentarias, así respecto al orden de suceder como a la cuantía de los derechos sucesorios y a la validez intrínseca de sus disposiciones, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren.

La Comisión Codificadora que preparó el proyecto del Código Civil Revisado catalogó el cambio al Art. 10 del Código Civil, supra, como una de las reformas más importantes al Título Preliminar de ese cuerpo legal. Bracons v. Registrador, supra, pág. 757. Su propósito fue

> restringir la doctrina de los estatutos personal y real, tomando en cuenta y aplicando el principio general del derecho civil americano de que los derechos respecto de los bienes inmuebles han de regularse totalmente, así en cuanto a la contratación como en cuanto a los derechos hereditarios, por la ley del país en que están sitos.

Bracons v. Registrador, supra, pág. 757.

Nótese que el cambio consistió en la supresión de "la excepción contenida en el artículo concordante del Código Español respecto al caso de sucesión hereditaria". L. Muñoz Morales, Reseña Histórica del Código Civil de Puerto Rico, Junta Editora de la Universidad de Puerto Rico, Río Piedras, Puerto Rico, 1947, pág. 25.[2] Lo anterior "tuvo el efecto de colocar nuestro estatuto sucesoral de conflicto de leyes dentro de la vertiente germánico pluralista,

---

[2] Ya en 1960 Mirabal Conde previó las injusticias que se evitaron con la eliminación del segundo párrafo del Art. 10 del Código Civil, supra. A esos efectos señaló que

> [e]l desarrollo de la teoría territorial en Puerto Rico ha impedido ciertas soluciones que hubiesen resultado injustas y que, bajo otras circunstancias en otras épocas, podrían haberse justificado por medio de doctrinas abstractas. Una reintroducción de la primitiva redacción del Artículo 10, podría llevarnos a situaciones completamente faltas de justicia integral. Por ejemplo, un ciudadano de Estados Unidos domiciliado en cualquier estado de la unión (ya sea "americano" o "puertorriqueño") podría impunemente desheredar a su hijo legítimo en Puerto Rico. Esta ha sido la realidad en otras jurisdicciones donde aún impera este precepto en su forma original. Así vemos cómo en las Islas Filipinas un causante domiciliado en Illinois puede válidamente excluir de su herencia a un hijo legítimo aun cuando las leyes Filipinas no lo permitieran. Este resultado está obviamente reñido con la clara orientación social que se ha dado a nuestro derecho en los últimos años. También, de reintegrarse al derecho puertorriqueño, podría tener resultados contraproducentes si consideramos la creciente comunidad de intereses entre Puerto Rico y los diferentes Estados de la Unión norteamericana.

R.A. Mirabal Conde, La regla *lex rei sitae* en la doctrina puertorriqueña de conflicto de leyes, 30 Rev. Jur. U.P.R. 57, 74 (1961).

específicamente la de Estados Unidos". E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 578. Lo mismo expresó la Comisión Codificadora al explicar que era "indudable que la mente del Congreso [con relación al criterio que utilizó para ordenar la revisión] fué poner las instituciones de la isla en más estrecha harmonía [sic] con el sistema americano…". L. Muñoz Morales, op cit., pág. 23. Por eso, "se notó bastante en este Código [de 1902] la influencia del Criterio Norteamericano, porque no sólo se hicieron aquellas modificaciones que naturalmente exigía el cambio de régimen, sino que se intercalaron artículos del Código de Louisiana, e introdujeron otras doctrinas radicalmente opuestas a nuestro histórico Derecho Civil…". Íd. Por ello, "[c]ualquier examen que se haga en torno al alcance del Artículo 10 debe estar precedido de un examen de la regla norteamericana en el ámbito sucesoral de conflicto de leyes". E. Martínez Moya, supra, pág. 578.

En la reciente decisión de S.L.G. Rodríguez Rivera v. Bahía Park, 180 D.P.R. 340, 369 (2010) reafirmamos que "Puerto Rico tiene un sistema legal mixto". Véase, además, J. Trías Monge, The Structure of the American Legal System – Its Sources, Forms and Theory of Law, 51 Rev. Jur. U.P.R. 11, 16 (1982). Explicamos que "[e]ste híbrido es el resultado exitoso de la interacción centenaria de principios legales, casuística, leyes y códigos

provenientes tanto del derecho civil español como del derecho consuetudinario (*common law*) estadounidense". Íd. A raíz de ello, en el pasado hemos adoptado "doctrinas y normas de interpretación del *common law* cuando las hemos considerado acertadas y enriquecedoras de nuestro Derecho". Íd., citando a <u>Arthur Young & Co. v. Vega III</u>, 136 D.P.R. 157, 169 (1994). Ahora bien, su adopción no debe hacerse a la ligera. "Lo crucial es que lo hagamos con la reflexión y corrección debida, para que no desnaturalicemos los principios de derecho civilistas y del derecho consuetudinario que constituyen parte fundamental de nuestro ordenamiento legal autóctono y que, en conjunto, en sus ámbitos respectivos, conforman el derecho puertorriqueño contemporáneo". Íd.

**A-Conflicto de leyes en el ámbito sucesoral estadounidense.**

En los Estados Unidos impera la norma general de que los bienes inmuebles se rigen por la ley del estado en que estén sitos, mientras que los muebles se gobernarán por la ley del último domicilio del causante. Russel J. Weintraub, <u>Commentary on the Conflict of Law</u>, 6ta ed., New York, Foundation Press, 2010, cap. 8, pág. 573. Véase, además, Martínez Moya, <u>op cit.</u>, pág. 579. En otras palabras, los bienes inmuebles ser regirán por la ley del <u>situs</u>. Esta norma está fuertemente arraigada en el acervo jurídico estadounidense desde hace más de un siglo. Desde el 1900, el Tribunal Supremo de los Estados Unidos expresó en <u>Clarke v. Clarke</u>, 178 U.S. 186, 190-191 (1900): "It is a doctrine

firmly established that the law of a State in which land is situated controls and governs its transmission by will or its passage in case of intestacy". Véanse, además, Fall v. Eastin, 215 U.S. 1 (1909) (el Tribunal Supremo de los Estados Unidos reiteró la doctrina de que los tribunales de otros estados no tienen jurisdicción para entender en controversias sobre inmuebles ubicados fuera de su territorio) y De Vaughn v. Hutchinson, 165 U.S. 566, 570 (1897) ("It is a principle firmly established that to the law of the State in which the land is situated we must look for the rules which govern its descent, alienation and transfer, and for the effect and construction of wills and other conveyances").

El *First Restatement on Conflict of Laws* reiteró el principio básico de la regla del situs al establecer que su ley gobernará todo lo relacionado con los bienes inmuebles. A. P. Dwyer II, The Situs Rule, 4 Conn. Prob. L.J. 325, 330 (1989). La ley del *situs* es uno de los principios de derecho del *First Restatement* más abarcador hasta el momento; mantiene la mayoría de su autoridad hoy día, a pesar de que muchos tribunales han abandonado principios del First Restatement en otras áreas. Matter of Estate of Reed, 768 P.2d 566 (Wyo. 1989); Manderson & Associates, Inc. v. Gore, 193 Ga. App. 723, 389 S.E.2d 251 (1989). Como vemos hay todavía un área de derecho internacional privado en la que las ideas del First Restatement prevalecen: las interrogantes que involucren bienes inmuebles se

determinarán por la ley del situs. Esa era la postura del *First Restatement*, es la posición esencial del *Second Restatement* y es la regla en la jurisprudencia contemporánea. Véanse, Andrew P. Dwyer II, op cit., págs. 330-332; R. Alden, Modernizing the Situs Rule for Real Property Conflicts, 65 Tex. L. Rev. 585, 587 (1987). 589-591.

Los profesores McDougal, Felix y Whitten opinan similar al revelar que la norma prevaleciente en los estados es:

> If a decedent at death own interest in land …, the land descends to heirs or others according to the entire law, including the conflicts law, of the place where the land is located. If the decedent leaves land in more than one state, each portion of the land descends according to the whole law of its separate situs, regardless of the manner of descent of other portions of the land elsewhere situated. The law of the decedent´s domicile is irrelevant, unless the conflicts law of the situs refers some question to it.
>
> L. L. McDougal, III, R. L. Felix y R. U. Whitten, American Conflicts Law, 5ta ed., Transnational Publishers, Inc., Ardsley, NY, 2001 pág. 649.

El Juez Asociado Joseph Story recopiló, por primera vez, de forma coherente y organizada en 1865, las normas de conflictos de leyes en los Estados Unidos en su famoso tratado: *Commentaries on the Conflict of Laws*. R. Alden, Modernizing the Situs Rule for Real Property Conflicts, 65 Tex. L. Rev. 585, 587 (1987). Para la preparación de ese tratado, descansó en las leyes romanas y europeas, según

esbozadas por juristas de ese continente, y especialmente por el "common law" inglés. Íd.

En las controversias que involucraban tierras, los abogados y las cortes inglesas asumían que la ley inglesa gobernaba. Por eso su jurisprudencia contiene muy poca discusión sobre la norma del situs. Íd., pág. 588. Esa suposición no era sorprendente pues Inglaterra no estaba dividida en estados soberanos y sus tribunales se abstenían de considerar casos que requerían la aplicación de leyes extranjeras. Íd. La distribución histórica de poder entre los tribunales del "common law" inglés -que tenían jurisdicción exclusiva sobre el título de las tierras en Inglaterra- y las cortes eclesiásticas -que actuaban conforme a equidad- también afectó las leyes sobre la propiedad inmueble. Íd. La manera celosa en que los tribunales del "common law" inglés guardaban su jurisdicción sobre la propiedad inmueble los indispuso para aplicar cualquier otra ley que no fuera la suya en asuntos que involucraran tierras. Íd.

A igual conclusión arriba Rafael A. Mirabal Conde en la que fue su tesis de derecho. R. Mirabal Conde, op cit., págs. 60-61. Explica que "[t]oda la doctrina, la jurisprudencia y la legislación norteamericana, con ligeras variaciones, ha seguido la doctrina territorial". Íd., pág. 61.

> Es esta doctrina mayormente el resultado de la búsqueda de principios razonables y viables necesarios para implementar las relaciones jurídicas de una nación en dinámico crecimiento…

Story en una de las más reveladores exposiciones de su pensamiento, opina que, independientemente de las dificultades que confrontan los juristas continentales europeos que sostiene la validez del estatuto real, hay ciertas excepciones prácticas a la posición de esos juristas que sacuden los fundamentos de la tesis que sustentan. Cree más fácil buscar la simplicidad en los sistemas que tratar de reconciliarlos con los deberes e intereses de todas las naciones en todos los casos.

Story, como vemos, parte del principio que las leyes no pueden aplicarse extraterritorialmente y que es bizantina cualquier discusión que pretenda darle tal vigencia a la ley del país.

Íd., págs. 60-61.

Sobre la verdadera razón de esta regla mencionamos también en Colón et al. v. El Registrador, 22 D.P.R. 369, (1915), haciéndonos eco de las expresiones del profesor Raleigh Minor, que

[p]uesto que la propiedad inmueble radica para siempre en el Estado en que se encuentra y como ningún otro Estado puede tener jurisdicción sobre la misma se deduce necesariamente que no puede adquirirse en definitiva ningún derecho, título o interés sobre ella a no ser que sea consentido por las cortes de ese Estado de acuerdo con sus leyes. Las cortes de ningún otro Estado pueden resolver en definitiva tales cuestiones de modo que confieran o priven a un litigante de un derecho a la propiedad. Por otra parte, las cortes del lugar donde radica la propiedad deberán ser estrictamente rigurosas en exigir que se cumpla con la ley del sitio en que se encuentra dicha propiedad en lo que respecta al traspaso del título a esa clase de propiedad. Las prácticas (policies) de cada Estado con respecto a traspasos de bienes inmuebles comprendidos en sus límites están consideradas justamente entre las más importantes de todas sus prácticas con respecto a las cuales no se tolerará ninguna intromisión extraña. Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan a la entrega, traspaso y gravamen de bienes inmuebles situados

dentro de sus límites sean lo más terminantes y precisas posibles. Se exigen formalidades especiales que no se requieren en otras cuestiones. Y es sumamente importante que las inscripciones legales de dichas transacciones las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.
…

Ni pretenderán las cortes de otros Estados hacer valer sus propias leyes relativas a los bienes inmuebles situados en otras partes…, principalmente por la absoluta imposibilidad en que se encuentran para dictar cualquier sentencia o decreto que sea definitivo y eficaz para traspasar cualquier derecho sobre el inmueble… Viene pues, a ser un principio bien establecido de derecho internacional privado, sostenido por un fuerte núcleo de autoridades, que todas las cuestiones relativas a traspasos de  título sobre bienes donde quiera que surjan se regirán por la lex situs, o sea por la ley del tribunal en que finalmente deban ser resueltas en definitiva todas esas cuestiones.

Íd.

Posteriormente, como señaláramos, el *Restatement on Conflict of Laws* solidificó la postura absolutista del "common law". Por eso refería todas las controversias sobre bienes inmuebles a la ley del sitio. Alden, op cit., pág. 589. Ahora bien, la regla del situs no solo controla la ley a aplicarse, sino también la jurisdicción de los tribunales para entender en controversias que comprendan bienes inmuebles fuera de su jurisdicción. Es decir, la norma prevaleciente en los Estados Unidos es que un tribunal no tiene jurisdicción para ver un caso en que la controversia sea sobre un bien inmueble localizado fuera de su jurisdicción aunque el tribunal aplique la ley del sitio en que el inmueble se encuentre localizado. Íd., pág. 590.

("Even if a nonsitus court … applied the law of the situs, a decree affecting title extrastate land would still be void for want of jurisdiction").

Es la opinión de Robby Alden que con las decisiones del Tribunal Supremo de los Estados Unidos en Clarke v. Clarke, supra, y Fall v. Eastin, supra, la fórmula de conflicto de leyes adoptada en su tratado por el Juez Story se convirtió en una regla firmemente establecida para la jurisdicción de los tribunales. Precisamente, los pronunciamientos en Pennoyer v. Neff, 95 U.S. 714 (1878), que estableció que la jurisdicción de un tribunal no se extendía más allá de las fronteras de su estado, afianzaron aún más esa norma. Dada la preminencia de la teoría del poder territorial para la jurisdicción, era de esperarse que el Tribunal Supremo de Estados Unidos concluyera que un tribunal carecía de jurisdicción en controversias sobre tierras extraterritoriales. A la luz de esa postura, solo un tribunal del sitio tiene poder sobre sus fronteras. Por esa razón, en Clarke v. Clarke, supra, y Fall v. Einstein, supra, se relevó a los tribunales del situs de la obligación de otorgarle entera fe y crédito a los decretos de los tribunales de otros estados. Art. IV, Sec. 1, Const. E.E.U.U. L.P.R.A., Tomo 1.

Desde Fall v. Eastin, supra, el Tribunal Supremo de los Estados Unidos ha hecho poco para dispersar la noción de que solo los tribunales del situs tienen jurisdicción sobre la materia para afectar el título sobre las tierras.

Weintraub, op cit., pág. 582. En 1963, el Tribunal Supremo de Estados Unidos determinó en Durfee v. Duke, 375 U.S. 106 (1963) que se le debe dar entera fe y crédito al hallazgo jurisdiccional de que la tierra está dentro del estado adjudicador. Íd. Al concluir como tal, el Juez Asociado Stuart expresó que el estado de Nebraska solo tendría jurisdicción sobre la materia si la tierra en controversia estaba en Nebraska. Íd., págs. 582-583. Véanse, además, Rozan v. Rozan, 129 N.W.2d. 694 (N.D. 1964); McRary v. McRary, 228 N.C. 714, 47 S.E.2d. 27 (1948); Fire Ass´n v. Patton, 15 N.M. 304, 107 P. 679 (1910); Cortney v. Henry, 114 Ill.App.635 (1904).

A igual conclusión llegó en 1998 el Tribunal Supremo Federal, por voz de la Jueza Asociada Ginsburg, en Baker v. General Motors Corp., 522 U.S. 222 (1998). Allí expresó:

> Orders commanding action or inaction have been denied enforcement in a sister State when they purported to accomplish an official act within the exclusive province of that other State or interfered with litigation over which the ordering State had no authority. **Thus, a sister State's decree concerning land ownership in another State has been held ineffective *to transfer title***, see *Fall* v. *Eastin,* 215 U.S. 1, 54 L. Ed. 65, 30 S. Ct. 3 (1909), although such a decree may indeed preclusively adjudicate the rights and obligations running between the *parties* to the foreign litigation, see, *e.g.,* *Robertson* v. *Howard,* 229 U.S. 254, 261, 57 L. Ed. 1174, 33 S. Ct. 854 (1913) ("It may not be doubted that a court of equity in one State in a proper case could compel a defendant before it to convey property situated in another State.")(Énfasis nuestro.)

Íd, pág. 236.[3]

Weintraub opina que para romper el círculo de razonamiento que concluye que los tribunales del "non-situs" carecen de jurisdicción para disponer sobre el título de tierras ubicadas fuera de su jurisdicción, es necesario establecer que el permitirlo

> is so unfair, so inappropriate, so outrageous, as to deprive the party adversely affected of due process of law. One difficulty with such a proposition is that it proves far too much. If this were so, the decree of the non-situs court affecting interests in realty would be void, and recognition of it not only would not be required under the full-faith-and-credit clause, but also would be forbidden as a violation of due process.

Weintraub, op cit., pág. 586.

Por esa razón, algunos tribunales "en el situs del inmueble le han dado efectividad de varias maneras a las sentencias de los tribunales de otras jurisdicciones que

---

[3] La Opinión Disidente correctamente percibió que en el caso de Robertson v. Howard, supra, se determinó que la Corte de Quiebras en un estado tenía jurisdicción para ordenar la venta de propiedades en otro estado **por el tipo de litigio que se trató**, a saber, un caso de quiebra. Las controversias de quiebra son de naturaleza particular, razón por la cual el Congreso de los Estados Unidos creó una corte con única jurisdicción para entender en esos casos. Por eso, es incorrecta la afirmación de la disidencia de que la doctrina del *lex situs* no es imperativa. De la naturaleza misma de la decisión del Tribunal Supremo de Estados Unidos, a los efectos de que los tribunales de un estado **no tienen jurisdicción sobre la materia** para transferir título sobre bienes inmuebles ubicados en un estado hermano, se desprende su carácter obligatorio. Dudamos que esa norma diáfana pueda catalogarse como meramente directiva. Y es que lo que está en juego es vital: se trata de la soberanía de los estados sobre su territorio.

afectan el interés sobre el título de las partes que litigan en los tribunales que no son el <u>situs</u>". (Traducción nuestra.)("at the situs of real state have given effect in various ways to decrees rendered in other jurisdictions by courts exercising in personam jurisdiction to affect the interest in the realty of the parties before the non-situs courts"). Íd.

Los argumentos a favor de la regla del <u>situs</u> se fundamentan en que se protege la integridad y la efectividad de los registros de la propiedad. Sin esta norma, los investigadores de título estarían obligados a analizar leyes foráneas para determinar el efecto de la transmisión, y a su vez, investigar en las cortes de otra jurisdicción si alguna otra litigación existente destruye los intereses de las partes. Por ende, la investigación en los registros de la propiedad sería muy costosa, y sobre todo, incierta. Más importante aún, con esta regla se protege la norma de que solo el sitio tiene poder sobre sus tierras y a su vez, se protegen los intereses de los estados en su uso propio y se promueve la libre circulación. Por último, se protegen las expectativas de las partes, al prometerse certeza y uniformidad en los resultados y facilidad de ejecución. R. Alden, <u>op cit</u>., pág. 591-597.(Traducción nuestra.)

Idénticos fundamentos esboza la profesora Martínez Moya al afirmar que

> [l]as razones principales que, sin embargo, han dado los especialistas para explicar la adopción de la norma *lex situs* son dos: Primero, como los inmuebles están bajo el control de las autoridades del estado donde están localizados y ninguna determinación sobre los mismos puede realizarse sin la participación de tales organismos, es natural y conveniente que cualquier sentencia que dicte un tribunal extranjero esté fundamentada en la *lex situs*. De lo contrario, se correría el riesgo de que la sentencia no fuera eficaz en el lugar donde estén localizados los inmuebles. Segundo, es la solución más práctica ya que le brinda una mayor estabilidad a los registros de la propiedad. Las personas pueden consultarlos con la certeza de que el tratamiento jurídico de los inmuebles allí registrados estará determinado por la *lex situs*. De lo contrario, las investigaciones de título resultarían muy onerosas y, en consecuencia, demasiado costosas ya que se tendría que estudiar legislación extraña a la del propio estado donde los inmuebles estén ubicados.
>
> E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 580.

Argumentos similares expresamos en Roselló Puig v. Rodríguez Cruz, supra, págs. 104-105, al aseverar que el Art. 10 del Código Civil, supra, incorporó el principio general del derecho estadounidense respecto a que los bienes inmuebles se regulan totalmente por la ley del lugar en que estén sitos. Manifestamos que

> en el derecho estadounidense se le da gran énfasis al hecho de que la propiedad inmueble se rige única y exclusivamente por las leyes del estado en que esté sito el inmueble. Ello evita que surjan conflictos entre estados hermanos en relación con la ley

> que deba aplicarse respecto a las propiedades inmuebles sitas en éstos. Además, propicia un ambiente de mutua deferencia respecto al dominio y la soberanía de éstos sobre el bien en cuestión, a la vez que promulga la aplicación uniforme de las leyes a todas las propiedades inmuebles en un mismo territorio. A su vez, introduce un alto grado de previsibilidad, al mismo tiempo que refleja el control que el estado puede ejercer sobre los bienes que se encuentran en su territorio. Es claro que el estado en el que está ubicado el inmueble posee un interés particular sobre éste en vista de que precisamente esa propiedad es inamovible.

Roselló Puig v. Rodríguez Cruz, supra, págs. 105-106. Véase, además, American Law Institute, Restatement of the Law Second, Conflict of Laws 2d., Vol. 2, Sec. 222.

Amerita señalar que la regla del situs ha recibido muchísimas críticas por parte de los tratadistas que han estudiado el tema. Íd., págs. 597-598. Véase, además, R. J. Weintraub, op cit., cap. 8. Los tratadistas también consideran que, aunque en ciertas ocasiones la regla es conveniente si se trata de la protección de compradores bona fide o del uso apropiado de las tierras, en ocasiones no es pertinente. Proponen una aplicación menos mecánica de la regla, que se circunscriba a analizar si el interés estatal para su aplicación es conveniente en la situación particular que se presente. Bajo esa filosofía, los límites modernos en la jurisdicción de un tribunal están dirigidos a proteger a las personas, no las tierras o los intereses estatales en ellas. Íd.

Por último, algunos estados utilizan la ficción doctrinal del "equitable conversion" o doctrina de la conversión para escapar los efectos del sistema germánico de fragmentación. Con esa doctrina se

> subsume a los inmuebles bajo la categoría de bienes muebles, lográndose así que la masa hereditaria se conciba como una universalidad regida por la ley del último domicilio del causante. Esta ficción se utiliza casi siempre en aquellos casos en que el causante, a pesar de dejar bienes inmuebles en distintos estados, dispone que los mismos sean vendidos para satisfacer la participación de sus herederos.
>
> Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 582. Véase, además, Weintraub, op cit., pág. 595-598.

**B- Conflicto de leyes en el ámbito sucesoral puertorriqueño.**

El primer caso en el que este Tribunal tuvo que dilucidar el alcance del Art. 10 del Código Civil, supra, fue Hecht v. Hecht, supra. El Sr. Felipe Hecht era un ciudadano puertorriqueño domiciliado en Ginebra, Suiza. Como parte de su patrimonio, tenía bienes en Suiza y en Puerto Rico. Antes de su muerte, otorgó varios testamentos mancomunados en la Isla, junto con su esposa. En el último de ellos, el matrimonio instituyó como herederos universales a sus cuatros hijos. Por su parte, el señor Hecht reconoció a Margarita Hecht como hija.

Al morir el señor Hecht, su hija Margarita instó un pleito contra la sucesión de su padre. Arguyó que el último

testamento la privaba de la legítima forzosa que nuestro ordenamiento jurídico le garantizaba como hija. Luego de varios trámites procesales, la sucesión demandada presentó un escrito en que solicitaron que la controversia se circunscribiera a los bienes existentes en Puerto Rico, porque los tribunales de la Isla carecían de jurisdicción para decidir sobre los bienes inmuebles sitos en Suiza. Este Tribunal, amparándose en la corriente romana universalista, expresó que

> [e]l haber hereditario, sean cuales fueren los elementos que lo integran, constituye una sola masa, y no puede liquidarse y partirse, incluyendo en esas operaciones unos bienes y excluyendo otros. Los derechos que sobre esa masa asistan a la demandante doña Margarita Hecht no pueden definirse y determinarse, teniendo en cuenta únicamente los bienes hereditarios existentes en Puerto Rico, con exclusión de los que existan en el extranjero, pues se dividiría así la continencia del negocio con perjuicio de sus derechos.

Hecht v. Hecht, supra, pág. 237.

Añadimos que aunque no se hubiera traído al juicio prueba sobre la legislación vigente en Suiza para casos de derecho sucesorio con elementos de derecho internacional privado, "esa omisión, sea cual fuere su trascendencia, no p[odía] perjudicar la integridad de los derechos que asist[ía]n a doña Margarita Hecht sobre los bienes de su difunto padre". Íd., pág. 237. Señalamos

> que existiendo bienes inmuebles pertenecientes a la herencia radicados en país extranjero, en todo lo que sea necesario se aplique para la práctica

de las operaciones testamentarias las leyes del país en donde dichos bienes están situados. Si las leyes de Suiza prohíben la adquisición por un extranjero de bienes raíces allí situados, o limita la extensión de la adquisición, hablamos en mera hipótesis, tales leyes deben ser respetadas, por ser principio general de derecho internacional privado, basado en el concepto de soberanía de un Estado, sea cual fuere éste, que la jurisdicción de los tribunales de otro Estado no puede afectar los bienes raíces en aquél situados.

Íd., págs. 237-238.

Sin embargo, acto seguido pronunciamos que

ese principio no arguye falta de jurisdicción en la corte sentenciadora para ordenar que en la fijación de los derechos hereditarios de doña Margarita Hecht se tenga en cuenta la masa total de bienes que dejara su difunto padre, pues al proceder así no dispone que determinados bienes raíces se adjudiquen a la demandante, y no extiende, por tanto, su acción de un modo concreto a bienes situados en país extranjero. En el presente caso no se trata de la posesión o propiedad de bienes raíces o inmuebles, sino de la distribución del as hereditario de don Felipe Hecht, que comprende el conjunto o universalidad de todos los bienes relictos por el mismo.

Hecht v. Hecht, supra, págs. 237-238.

Como puede notarse, aunque reconocimos que "en todo lo que sea necesario se aplique para la práctica de las operaciones testamentarias las leyes del país en donde dichos bienes están situados", acto seguido afirmamos que "en la fijación de los derechos hereditarios se tenga en cuenta la masa total de bienes… pues no se trata de la posesión o propiedad de bienes raíces o inmuebles, sino de

la distribución del as hereditario de don Felipe Hecht, que comprende el conjunto o universalidad de todos los bienes relictos por el mismo". Sin lugar a dudas, esa afirmación ignoró la corriente germánica que caracteriza la letra del Art. 10, supra, en cuanto a controversias de derecho sucesorio en el campo del derecho internacional privado.

Diez años más tarde, este Tribunal aparentó abandonar la postura romano-universalista en Bracons v. Registrador, supra. En ese caso, el Sr. Salvador Baví Durall otorgó testamento en Barcelona, España, en que declaró que era catalán; "que la sucesión de sus bienes debía regularse por la legislación catalana; que legaba a su hijo Salvador Baví Bracons y a los demás que pudiera tener en el momento de su muerte, la cantidad que en concepto de legítima les correspondiera, y que de todos sus restantes bienes, muebles e inmuebles, derechos y acciones presentes y futuros, tanto de los radicados en España como de los que poseyera en Puerto Rico, o en cualquier otro punto, nombraba su heredera universal a su esposa Rosa Bracons y Vidal la cual podría disponer de dicha herencia a sus libres voluntades". Bracons v. Registrador, supra, pág. 755.

Cuando el señor Baví Durall falleció, su viuda acudió al Registro de la Propiedad de San Juan para solicitar que se inscribiera a su nombre una casa ubicada en la Calle Tanca de ese municipio. Para ello, la señora Bracons y Vidal presentó en el Registro de la Propiedad los

documentos correspondientes para la inscripción del inmueble a su nombre, junto con una consulta efectuada a un abogado español que pormenorizó los derechos que le correspondían a la viuda. El Registrador, tras verificar la información provista, inscribió únicamente "en cuanto a la tercera parte de la casa en cuestión y la negó en cuanto a las dos terceras partes restantes". Íd., pág. 755. Fundamentó su decisión así:

> 1. Que el causante legó a su hijo Don Salvador Baví Bracons y a los demás que tuviera la cantidad que en concepto de legítima le correspondiera sobre sus bienes, cuyo legado de legítima, por la muerte del legatario antes que la del testador, quedó sin efecto. 2. **Que tratándose de testamento otorgado por un extranjero en su país, en el que se trasmiten bienes inmuebles radicados en esta isla, es de aplicación el artículo 10 del Código Civil vigente; y debe regularse la cuantía de los derechos sucesorios de la heredera Doña Rosa Bracons y Vidal con arreglo a las prescripciones de este código: determinada conforme al mismo la legítima correspondiente al hijo premuerto como ascendente a las dos terceras partes de la herencia, resta sólo para la heredera instituida la tercera parte de la finca, que es la de libre disposición, según dicho texto.**

> Íd.

Inconforme, la señora Bracons presentó un recurso gubernativo. En este adujo que según la ley del causante, la catalana, cuando un heredero o legatario premuere al testador, la porción que deja vacante acrece la porción del otro coheredero. Por consiguiente, la viuda argumentó que como el hijo premurió a su padre, sus derechos hereditarios

se aumentaban. Amparados en <u>Colón et al. v. El Registrador de Aguadilla</u>, 22 D.P.R. 369 (1915), rechazamos la postura de la viuda. Expresamos que debía aplicarse la ley de Puerto Rico, ya que con los cambios efectuados al Código Civil en 1902 se "aplic[ó] en Puerto Rico íntegramente la teoría americana, esto es, que la *lex rei sitae* es la norma que debe seguirse al determinar la capacidad legal de las partes en transacciones sobre bienes inmuebles". <u>Bracons v. Registrador</u>, <u>supra</u>, pág. 757. Así las cosas, concluimos que actuó correctamente el Registrador al inscribir a favor del hijo premuerto las dos terceras partes del inmueble.

Del anterior análisis se aprecia que

> el Tribunal se negó a aplicar la ley nacional del causante y tampoco vio el caudal hereditario del causante como un todo ideal independientemente de donde estuviesen localizados los bienes. Se circunscribió, por el contrario, a aplicar las leyes sucesorales locales al inmueble localizado en Puerto Rico, con total abstracción de los bienes localizados en España.
>
> Martínez Moya, <u>Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes</u>, <u>op cit.</u>, pág. 577.

Con ese proceder, este Tribunal abrazó la letra clara del Art. 10 del Código Civil y su acepción germánica. Lamentablemente, la vida de esta norma apenas duró trece lustros, pues en 1982 la abandonamos en <u>Cabrer v. El Registrador</u>, 113 D.P.R. 424 (1982).

Allí, la Sra. Mary Marr Chamberlin y el Sr. Wilson Chamberlin, ciudadanos americanos y domiciliados en Westport, Connecticut eran dueños de un inmueble situado en

la Isla. Antes de su muerte, la señora Marr Chamberlin otorgó un testamento en el estado de Connecticut en que instituyó varios legados y dispuso sobre el inmueble en que residía junto a su esposo en el mencionado estado. En el testamento no hizo mención de la propiedad que poseía aquí en Puerto Rico.

Posteriormente, la señora Marr Chamberlin falleció. Al amparo de la disposición testamentaria de su difunta esposa que le legaba el remanente de sus bienes, el viudo convino con la Sra. Gladys Cabrer la venta del inmueble localizado aquí. Sin embargo, el señor Chamberlin falleció antes de que se otorgara la escritura de compraventa, por lo que su albacea procedió a otorgar un poder para que se otorgara y así se hizo. Empero, cuando se presentó ante el registro la documentación pertinente para que se inscribiera el dominio de la propiedad a favor del señor Chamberlin y de la señora Cabrer, el Registrador se negó tras concluir que el testamento era nulo por preterir a las dos hijas de la testadora.

Luego de una discusión de la figura de la preterición, resolvimos que a las hijas no se les pretirió pues del testamento surgía que a una se le legó un anillo de diamantes y a la otra el interés de una propiedad y los bienes muebles en ella ubicados. Así pues, concluimos que no se podía denegar la inscripción bajo el pretexto de que se pudiese lesionar la legítima de las herederas forzosas,

pues estas tenían a su haber una acción de complemento de legítima. Al razonar de esa forma

> concebi[mos] el caudal de la causante como una universalidad compuesta por todos los bienes independientemente de su naturaleza mueble o inmueble y del lugar de su ubicación. O, lo que es igual, como se les dejó parte del caudal relicto no hubo preterición. Esta solución responde a la orientación romano-unitaria que concibe el patrimonio como una universalidad, no importa el lugar de ubicación de los bienes.
>
> E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 600.

Evidentemente, con ese razonamiento volvimos a alejarnos del Art. 10 del Código Civil, supra, pues de haber aplicado el modelo germánico, debimos resolver

> que a la muerte de la testadora habían surgido varias masas sucesorales o patrimonios separados: uno correspondiente a los muebles el cual será gobernado por la ley del último domicilio del causante y otros diferentes en los distintos lugares donde hubiese inmuebles los cuales estarían regidos por la lex situs. A la luz de esa orientación el inmueble localizado en Puerto Rico formaría un patrimonio separado del resto de los bienes sobre el cual se aplicaría nuestro régimen de legítimas. Para que se entendiera que no había habido preterición, se les hubiese tenido que dejar a las hijas una participación en el inmueble de Humacao.
>
> E. Martínez Moya, Cabrer v. Registrador Un problema sucesoral de conflicto de leyes, op cit., pág. 600.

Véanse, además, E. Martínez Moya, El Derecho Sucesorio Puertorriqueño, pág. 87, n. 35; J.E. Dávila Rivera, op. cit., pág. 18.

La anomalía del caso de Cabrer v. El Registrador, supra, estriba en que aun cuando analizamos la controversia a la luz del crisol del sistema romano-unitario, aplicamos la ley de Puerto Rico para regular el contenido del testamento. Lo correcto era que, al concebir la sucesión como una unidad, aplicáramos la ley de Connecticut que era la del último domicilio de la causante. Véanse, E. Martínez Moya, El Derecho Sucesorio Puertorriqueño, pág. 87; J.E. Dávila Rivera, op cit., pág. 18; E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 600.

Recientemente este Tribunal tuvo la necesidad de adentrarse en este campo al resolver Roselló Puig v. Rodríguez Cruz, supra. Allí, tuvimos la encomienda de analizar si, conforme al estatuto formal de nuestro Código Civil, a saber el Art. 11, 31 L.P.R.A. sec. 11, surtía efectos en nuestra jurisdicción **un contrato** suscrito en el estado de Florida por unos cónyuges puertorriqueños que, sujetos al régimen de sociedad legal de gananciales, transfirieron a uno solo de ellos la titularidad exclusiva sobre un bien inmueble sito en ese estado. Tras sostener **la viabilidad del acto jurídico** efectuado en el estado de Florida, reconocimos el carácter privativo de la propiedad sita en el estado de Florida. Sin embargo, cabe precisar,

que en ningún momento adjudicamos el título de esa propiedad. Por el contrario, de conformidad con la regla del situs estatuida en el Art. 10, supra, aceptamos como un hecho indubitado el título de propiedad que ya venía del estado de Florida, al momento de analizar la controversia. Por ello, desacierta la Opinión Disidente cuando en la nota al calce 34 afirma que en Roselló Puig v. Rodríguez Cruz, supra, "[n]o se contempló que los tribunales de Puerto Rico no tuvieran jurisdicción para determinar a cuál de los ex cónyuges le pertenecía el bien inmueble sito en Florida que generó la disputa durante la división de bienes gananciales". Opinión Disidente, pág. 16, n. 34. A modo de recapitulación, amerita enfatizar que en Roselló Puig v. Rodríguez Cruz, supra, **ya había un título adjudicado**. Lo que hicimos fue validar un negocio jurídico conforme las leyes donde el inmueble ubicaba.

Con el beneficio del marco doctrinal reseñado, pasemos a analizar la controversia que hoy nos ocupa.

V

En su alegato ante este Tribunal, los peticionarios afirman que "una vez probado que don Alfonso era propietario de bienes inmuebles sitos en la República Dominicana, procede que el TPI dictamine que los mismos forman parte de su caudal y practique su partición y adjudicación final de los mismos [sic] entre sus co-herederos, Doña Ginette y la sucesión de don Wallace según corresponda". Solicitud de *certiorari*, pág. 11. Fundamentan

su contención en nuestros pronunciamientos en <u>Hecth v. Hecht</u>, <u>supra</u>, a los efectos de que la herencia constituye una sola masa hereditaria, independientemente de donde están sitos los bienes que la integran. Por ello no puede liquidarse y partirse, incluyendo en esas operaciones unos bienes y excluyendo otros. <u>Solicitud de *certiorari*</u>, pág. 13. No tienen razón.

El pronunciamiento que hicimos en <u>Hecht v. Hecht</u>, <u>supra</u>, pág. 237, de que el haber hereditario "constituye una sola masa, y no puede liquidarse y partirse, incluyendo en esas operaciones unos bienes y excluyendo otros" es correcto si el causante no deja bienes inmuebles fuera de Puerto Rico. Si en la herencia hay bienes inmuebles en otra jurisdicción, entra a escena el Art. 10 del Código Civil, <u>supra</u>, y su visión germánica.

Los peticionarios nos invitan a aplicar en este caso la doctrina del *forum non conveniens* recientemente incorporada en nuestro ordenamiento jurídico procesal en <u>Ramírez Sainz v. S.L.G. Cabanillas</u>, <u>supra</u>. Amparándose en los pronunciamientos de ese caso, arguyen que "[n]o existe … impedimento para que nuestros tribunales apliquen las leyes de países extranjeros, en este caso las de la República Dominicana". Sostienen que resulta oneroso requerir a los herederos que en los casos en que un causante haya dejado bienes en distintos países, tengan que iniciar un procedimiento separado y aislado para su partición en cada uno de los países donde ubiquen bienes

inmuebles. No les asiste la razón. Sabido es que "antes de analizar si procede acoger una moción de *forum non conveniens*, el Tribunal de Primera Instancia está obligado a constatar que efectivamente tiene jurisdicción y competencia sobre las partes y la materia". Ramírez Sainz v. S.L.G. Cabanillas, supra, pág. 38. Es decir, la doctrina del *forum non conveniens* presupone la existencia de jurisdicción por ambos foros. ("The application of the *forum non conveniens* doctrine presupposes the existence of jurisdiction on behalf of the court") (Citas omitidas.) M. Karayanni, Forum Non Conveniens in the Modern Age: A Comparative and Methodological Analysis of Anglo-American Law, Ardsley, New York, Transnational Publishers, Inc., 2004, pág. 21. Véase, además, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (1947).

La regla del situs recogida en nuestro Art. 10, supra, no solo controla la ley a aplicarse, sino también la jurisdicción de los tribunales para adjudicar las controversias. Al ser así, los tribunales de Puerto Rico no ostentan jurisdicción extraterritorial, por lo que la aplicación a este caso de la doctrina de *forum non conveniens* es improcedente. Es decir, nuestros tribunales no tienen autoridad para atender acciones legales sobre la titularidad de bienes inmuebles que un causante deja en otro país. Ese fue el efecto de la enmienda introducida al Art. 10 del Código Civil, supra, en 1902.

Por consiguiente, cuando un ciudadano domiciliado en Puerto Rico deja bienes en el extranjero, se abrirán diferentes masas de bienes, dependiendo de su categoría, a saber, inmuebles o muebles. Cuando se trate de bienes muebles, estos se regirán por la ley del último domicilio del causante. Lokpez v. Fernández, 61 D.P.R. 522 (1943). Por el contrario, cuando se trate de bienes inmuebles, como ocurre aquí, se abrirán diferentes masas sucesorales dependiendo de los lugares en los que ubiquen y cada una de ellas se regirá por la *lex situs*. E. Martínez Moya, Cabrer v. Registrador: Un problema sucesoral de conflicto de leyes, op cit., pág. 594.

Con ese escenario, en primera instancia el tribunal en donde ubica el inmueble debe emitir su dictamen sobre la titularidad de ese bien. Luego de eso, nuestros tribunales deben tomar conocimiento judicial del dictamen que emitió el foro con jurisdicción sobre la propiedad inmueble y computarle un valor en la masa hereditaria. Para convalidar la sentencia en su día, se tomará en consideración lo dispuesto en la Regla 55 de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V, sobre exequátur. De igual forma, el valor que se le adjudique al bien inmueble en la masa hereditaria, dependerá de la prueba que las partes presenten al respecto.

La postura que adoptamos hoy ya fue pensada en el pasado. Precisamente el profesor suizo de Derecho Internacional, Atle Grahl Madsen, avala lo que aquí se

resuelve como una posible solución a la injusticia que
puede surgir cuando la ley del lugar en el que el inmueble
esté sito beneficia a un heredero por encima de otro. Sobre
el particular señala:

> [t]endremos que aceptar que los bienes
> inmuebles ubicados fuera de la tierra natal del
> difunto serán devueltos a todos aquellos
> sucesores de acuerdo al *lex situs*, pues ya a
> este punto, la ley personal del difunto no tiene
> poder alguno.
> La incógnita que permanece es si el
> beneficio que tienen ciertas personas bajo el
> *lex situs* deberá ser compensado en conexión con
> la distribución de la propiedad bajo el dominio
> de la ley personal. Se pueden pensar tres
> soluciones a este problema.
>
> (1) La herencia sujeta a la ley personal del
> difunto es distribuida sin tomar en cuenta
> el bien inmueble que está ubicado en el
> extranjero. esto significa la aceptación de
> la escisión.
> (2) El bien inmueble ubicado en el extranjero se
> incluye dentro de los activos de la
> sucesión. Ciertamente, este debe ser
> "distribuido" a todos aquellos herederos de
> acuerdo al *lex situs*, pero su valor debe
> deducirse de las partidas de aquellos
> herederos de la propiedad que se halla bajo
> la ley personal, en la medida en que sea
> posible. Esto implica la modificación del
> principio de sucesión universal (o
> unitaria) y el resultado es comparable a lo
> que conduzca la doctrina de elección.
> (3) No nos limitamos a deducir el valor de los
> bienes inmuebles ubicados en el extranjero
> de las partidas de la propiedad bajo ley
> personal, sino que también le concedemos a
> los herederos una acción por compensación
> para el beneficio que los herederos han
> tenido bajo la *lex situs*, por encima del
> valor de dichas partidas. Esto significaría
> tratar de aplicar el principio de sucesión
> universal (o unitaria) sin moderación
> alguna. (Traducción nuestra.)

Athle Grahl Madsen, <u>Unitary Succession and System of</u>

<u>Scission</u>, 28 Int´l & Comp. L. Q. 598, 607 (1979).[4]

Por consiguiente, con la adopción de esta solución se

evita la injusticia que podría surgir si en la jurisdicción

donde se ubica el inmueble del causante se le adjudica a

uno o más herederos una porción mayor a la que le

correspondería según el régimen de legítimas que dispone

nuestro sistema sucesoral. Además, brindamos uniformidad a

---

[4] We shall have to accept that the immovable property outside the deceased´s homeland will devolve upon those who are successors according to *lex situs*, for on this point the personal law of the deceased is powerless.

The question which remains is whether the benefit which certain persons have under the *lex situs* shall be compensated in connection with the distribution of the property which is under the dominion of the personal law. There are three thinkable solutions to this problem:

(1) The estate which is subject to the personal law of the deceased is distributed without taking the foreign immovable property into account. This means the acceptance of scission.

(2) The foreign immovable property is included among the assets of the estate. It must certainly be "distributed" to those who are heirs according to *lex situs*, but its value is deducted from the shares of those heirs in the property which is governed by the personal law, so far as they go. This implies a modification of the principle of universal (or unitary) succession, and the result is comparable to that to which the doctrine of election may lead.

(3) We do not stop at deducting the value of the foreign real property from the shares of the property governed by the personal law, but we also concede the successors a claim to compensation for the benefit which the heirs have had under *lex situs*, over and above the value of their said shares. This would mean that we attempt to apply the principle of universal (or unitary) succession without any moderation.

nuestra jurisprudencia antes mencionada que visualiza la sucesión *mortis causa* bajo la óptica del sistema romano.

Enfatizamos que la norma anterior será de aplicación únicamente en los casos en que el último domicilio del causante sea Puerto Rico. Cuando el causante estuvo domiciliado en otra jurisdicción al morir, los bienes muebles también se adjudicarán conforme a la ley de esa jurisdicción. Art. 10 del Código Civil, supra.

En vista de lo anterior, concluimos que los tribunales de Puerto Rico carecen de jurisdicción para adjudicar la titularidad de los alegados bienes inmuebles que el señor Valencia Jiménez dejó en la República Dominicana. En el caso que nos ocupa, corresponde presentar un pleito en los tribunales de ese país para que se determine la titularidad de los alegados bienes inmuebles que el señor Valencia Jiménez pudo dejar en la isla vecina. Sobre ese dictamen nuestros tribunales tomarán conocimiento judicial y le adjudicarán un valor al bien inmueble en controversia en la masa hereditaria conforme a la prueba sobre su valor que traigan las partes.

Se argumenta que este proceso es oneroso e inefectivo. Lo que debemos preguntarnos es si acaso no será oneroso para los tribunales de Puerto Rico tener que interpretar la ley de otra jurisdicción, en este caso un país extranjero. A lo anterior hay que sumarle las múltiples controversias que se suscitarán cuando una de las partes no esté de acuerdo con la interpretación que nuestros tribunales le

den a esa ley extranjera. Es evidente que ese proceso dilatará los procedimientos y conllevará costos para las partes.

VI

A. Como segundo señalamiento de error, el matrimonio Valencia-Catinchi aduce que el Tribunal de Apelaciones los privó de presentar en evidencia lo que se pueda obtener en el descubrimiento de prueba. Según ellos, eso impediría que se determine cuáles bienes serán traídos a la masa hereditaria. No nos convencen.

Las reglas que rigen el descubrimiento de prueba "se basan en el concepto básico de que antes del juicio toda parte en la litigación tiene el derecho a obtener el descubrimiento de toda la información que esté en posesión de cualquier persona". J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da ed., Publicaciones J.T.S., 2011, Tomo III, pág. 835. "[U]n amplio y liberal descubrimiento de prueba es la médula del esfuerzo de destruir de una vez y para siempre la deportiva teoría de justicia que tanto mina la fe del pueblo en el sistema judicial". Íd. Véase, además, Rivera Alejandro v. Algarín, 112 D.P.R. 830 (1982); Ortiz v. E.L.A., 125 D.P.R. 65 (1989). Las reglas que encaminan el descubrimiento de prueba procuran "que el juicio sea menos un juego de la gallinita ciega y más una contienda justa en que los hechos sean descubiertos en la más amplia extensión posible. La justicia no es un juego, ni un deporte, sino una empresa

formal a ser conducida seriamente". J.A. Cuevas Segarra, op cit., pág. 836.

En reiteradas ocasiones hemos dicho que "basta que una materia sea objeto de descubrimiento, para que exista una posibilidad razonable de relación con el asunto en controversia". Rodríguez v. Scotiabank de Puerto Rico, 113 D.P.R. 210 (1982); Medina Morales v. Merck, Sharp & Dhome, 135 D.P.R. 716 (1994). Por esa razón, "[c]ualquier duda en cuanto a la pertinencia, debe resolverse a favor de ésta. Existe una presunción favorable al descubrimiento de prueba". J.A. Cuevas Segarra, op cit., pág. 840. "El concepto de pertinencia tiene que interpretarse de manera cónsona con el principio rector de las reglas procesales; lograr la solución de las controversias de forma justa, rápida y económica". Íd., pág. 841.

La Regla 23.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, dispone que

> [e]l alcance del descubrimiento de prueba, a menos que sea limitado de algún modo por el tribunal, en conformidad con las disposiciones de estas reglas, será como sigue:
>
> (a) *En general.* Las partes podrán hacer descubrimiento sobre cualquier materia, no privilegiada, que sea pertinente al asunto en controversia en el pleito pendiente, ya se refiera a la reclamación o defensa de cualquier otra parte, incluso la existencia, descripción, naturaleza, custodia, condición y localización de cualesquiera libros, información almacenada electrónicamente, documentos u otros objetos tangibles y la identidad y dirección de personas que conozcan hechos pertinentes. No

constituirá objeción el que la información solicitada sea inadmisible en el juicio, siempre que exista una probabilidad razonable de que dicha información conduzca al descubrimiento de evidencia admisible.

"El propósito de esta liberal norma de descubrimiento de prueba es que aflore la verdad de lo ocurrido, evitando así los inconvenientes, sorpresas e injusticias que surgen cuando las partes ignoran hasta el día de la vista las cuestiones y los hechos que en realidad son objeto del litigio". J.A. Cuevas Segarra, op cit., pág. 841. Véase, Boitel Santana v. Cruz, 129 D.P.R. 725, 731-732 (1992).

B. En la resolución de 10 de septiembre de 2009 que emitió el Tribunal de Primera Instancia, lo que ese foro determinó fue que: (1) solo se tomaría en consideración el caudal existente al momento del fallecimiento del señor Valencia Jiménez; (2) que no permitiría el desfile de prueba de eventos acaecidos con anterioridad a la muerte del señor Valencia Jiménez y; (3) que controversias sobre los activos de las corporaciones que forman parte del caudal que pudieron ser apropiadas por el señor Valencia Mercader tienen que dilucidarse en pleitos separados.

Por su parte, el Tribunal de Apelaciones determinó que "se modifica la Resolución y Orden emitida por el TPI el 10 de septiembre de 2009, a los únicos efectos de que se permita un descubrimiento de prueba amplio y liberal conforme a lo dispuesto en esta Sentencia". Sentencia del Tribunal de Apelaciones, pág. 27; Apéndice del recurso, pág. 1957. Una lectura de la resolución del foro primario

deja palmariamente claro que el foro apelativo intermedio revocó su determinación referente a que no permitiría el desfile de prueba de eventos acaecidos con anterioridad a la muerte del señor Valencia Jiménez. Por ello, permitió un descubrimiento de prueba amplio y liberal sobre aquello que tenga una posibilidad razonable de relación con el asunto en controversia. De no ser así, ¿qué propósito tendría permitir el descubrimiento de esa prueba? Claro está, la admisibilidad de esa prueba en el juicio estará sujeta a los criterios de las Reglas de Evidencia. Véase Reglas 401-403 de Evidencia, 32 L.P.R.A. Ap. VI. Por todo lo anterior, concluimos que sujeto al cumplimiento con las Reglas de Evidencia, procede la presentación durante el juicio de evidencia producto del descubrimiento de prueba previo al deceso del señor Valencia Jiménez.

Por último, concluimos que es correcta la alegación de los peticionarios que, de probarse que el señor Valencia Mercader sustrajo bienes del patrimonio de su padre, su valor se debe imputar como adelanto de su legítima, aunque los obtuviera de una de sus corporaciones. Solicitud de certiorari, pág. 19. No vemos razón para que en el mismo pleito, como parte del descubrimiento de prueba, se indague acerca de las transacciones alegadas de fraude entre las corporaciones del señor Valencia Jiménez y Valencia Mercader. En el mismo pleito de partición de herencia se pueden dilucidar las reclamaciones de reivindicación de bienes que los herederos tengan entre sí. Ello incluye las

alegadas transacciones fraudulentas entre las corporaciones Valencia Shipping Agencies (Valencia Mercader) y Sea-Land of Puerto Rico (Valencia Jiménez).

Claramente el foro primario erró al determinar que no procedía el descubrimiento ni la presentación de prueba de los actos anteriores a la muerte del señor Valencia Jiménez. Resulta evidente que si este caso versa sobre una acción de complemento de legítima, es pertinente descubrir los actos anteriores a la muerte del causante que la pudieron haber afectado. Véanse, Regla 401 de Evidencia, 32 L.P.R.A. Ap. VI; Art. 578, 692, 735, 747 y 989 2023, 2281, 2361, 2373 y 2841. Claro está, la determinación de si procede o no el complemento de legítima se debe tomar luego, tras un juicio en su fondo en el que las partes tengan su día en corte. Rivera Rodríguez & Co. v. Lee Stowell, Etc., 133 D.P.R. 881, 888-889 (1993). Así pues, también es incorrecta la alegación de los recurridos de que si los peticionarios probaran una disminución en el patrimonio del señor Valencia Jiménez a favor del señor Valencia Mercader, a través de la transferencia de bienes corporativos del caudal, procedería una acción derivativa mediante un pleito independiente. Eso se puede dilucidar en este litigio.

VI

Por los fundamentos antes expuestos, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ginette Valencia Mercader; Rodolfo A. Catinchi y la Sociedad Legal de Gananciales por ellos compuesta<br><br>Peticionarios<br><br>v.<br><br>Ramón García García<br><br>Recurrido<br><br>Maeve Anne Sandiford, Edmond Valencia Byrd, Connie Valencia Byrd<br><br>Recurridos | CC-2010-1002 |

SENTENCIA

En San Juan, Puerto Rico, a 8 de noviembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la Sentencia del Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta disiente con opinión escrita a la que se unieron el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez. La Jueza Asociada señora Pabón Charneco no intervino y el Juez Asociado señor Feliberti Cintrón no interviene.

Larissa Ortiz Modestti
Secretaria del Tribunal Supremo Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ginette Valencia Mercader; Rodolfo A. Catinchi y la sociedad Legal de Gananciales por ellos compuesta<br>Peticionarios<br><br>v.<br><br>Ramón García García<br>Recurrido<br><br>Maeve Anne Sandiford, Edmond Valencia Byrd, Connie Valencia Byrd<br>Recurridos | CC-2010-1002 |

Opinión disidente emitida por la Jueza Asociada señora Fiol Matta a la cual se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 8 de noviembre de 2012.

En este caso, se presentan dos controversias. Una es sencilla y la otra muy compleja. En cuanto a la primera, estoy conforme con la Opinión mayoritaria: el Tribunal de Apelaciones resolvió correctamente que procedía un descubrimiento de prueba amplio y liberal sobre toda evidencia pertinente para identificar los bienes que forman parte del caudal hereditario así como la presentación en el juicio de la prueba descubierta que fuera admisible.[5]

---

[5] Valencia Mercader v. Sandiford, Opinión del Tribunal, págs. 45-49; Sentencia del Tribunal de Apelaciones KLCE 2009 1806, 30 de agosto de 2010, págs. 19-23, Apéndice del Certiorari, págs. 1951-1955.

En cuanto a la segunda, aunque comparto las preocupaciones que señala la Opinión mayoritaria, no estoy de acuerdo con la solución que propone para conciliar nuestra regla sobre conflicto de leyes con nuestra doctrina sucesoral ni con la conclusión de que los tribunales de Puerto Rico no tienen jurisdicción para atender interrogante alguna relacionada con bienes ubicados en otros países que forman parte de la herencia que se está distribuyendo en Puerto Rico.

Entiendo que la Opinión mayoritaria concluye incorrectamente que Puerto Rico está privado de jurisdicción para atender controversias sobre inmuebles localizados fuera de la Isla, conclusión cuya consecuencia es que las personas llamadas a la herencia se vean obligadas a llevar a cabo unos trámites legales demasiado extensos y onerosos. Contrario a lo que enuncia la Opinión, los tribunales de Puerto Rico tienen jurisdicción para, dentro de un solo pleito de partición, determinar los derechos sobre inmuebles ubicados en otros países y estados, aplicándole a esos bienes las leyes extranjeras pertinentes.

I

En 1902, nuestro ordenamiento jurídico de diseño civilista sufrió diversas enmiendas que respondieron al cambio de autoridad política en Puerto Rico. Como parte de esa reforma, a nuestro Código Civil se incorporaron principios del *common law* sin armonizarlos con las

doctrinas legales vigentes en el país.[6] El resultado de ese proceso inadecuado son las múltiples contradicciones que residen en nuestra legislación y se manifiestan cuando los hechos de un caso exigen una resolución que, para ser acorde a una regla, requieren que se relegue otra igualmente aplicable. Este Tribunal se ha visto en la obligación de buscar una salida a esas incongruencias legislativas en diversas ocasiones.[7] Hoy se enfrenta al choque de nuestra doctrina de Sucesiones proveniente de España con nuestra normativa sobre conflicto de leyes procedente de Estados Unidos.

Debemos comenzar por reconocer que no existe una solución perfecta para lograr la compatibilidad de nuestra visión sobre la herencia como una masa universal que se rige por una sola ley y nuestra regla de aplicarle a los bienes inmuebles las leyes del país en donde están ubicados, independientemente de si esos inmuebles pertenecen a una masa hereditaria que se está dividiendo en otro Estado. Todas las opciones para conciliar estas dos normas suponen discordancias teóricas e inconvenientes prácticos.

---

[6] *Véanse:* L. Muñoz Morales, <u>Reseña histórica y anotaciones al Código Civil de Puerto Rico</u>, Río Piedras, Ed. Universidad de Puerto Rico, 1947, págs. 22-25; J. Trías Monge, <u>El choque de dos culturas jurídicas en Puerto Rico</u>, Hato Rey, Ed. Equity, 1991, págs. 81-100.

[7] *Véanse, por ejemplo:* <u>Vilanova v. Vilanova</u>, 2012 T.S.P.R. 53; <u>Flecha v. Lebrón</u>, 166 D.P.R. 330 (2005), <u>Viuda de Ruiz v. Registrador</u>, 93 D.P.R. 914 (1967); <u>Mercado v. Mercado</u>, 66 D.P.R. 811 (1947).

Confrontamos una realidad fundamental: las concepciones sobre la ordenación de la propiedad y la familia vigentes en cada país moldean sus leyes sucesororales. En el Derecho Internacional Privado, los sistemas de ordenamiento sucesorio nacionales se catalogan en dos tipos principales, los de corte romano y los de corte germánico. El sistema romano, utilizado en la mayor parte de los ordenamientos civilistas, concibe el caudal hereditario como una unidad que debe ser regida por una sola ley. Esto debido a que se entiende que las normas sucesorales regulan relaciones de personas y la ordenación de los bienes que ellas poseen es accesoria. Por el contrario, el sistema germánico ve la herencia como una manera de atribuir bienes y se guía por normas relacionadas con la propiedad. Entonces, aplica a cada bien inmueble del patrimonio la ley del lugar en que esté ubicado, sin importar que con ello se creen muchas masas hereditarias independientes.[8]

El catedrático español de Derecho Internacional Miaja de la Muela señala que someter el caudal hereditario a una sola ley representa ventajas indudables: en el aspecto teórico, porque se rige de manera uniforme el patrimonio y la relación familiar; en el aspecto práctico, porque el fraccionamiento de los bienes crea dificultades al momento de partir, colacionar y computar las legítimas. Además,

---

[8] *Véase* E. Martínez Moya, *Cabrer v. Registrador*: Un problema sucesoral de conflicto de leyes, 59 Rev. Jur. U.P.R. 557, 561-565 (1990).

produce anomalías, pues una misma disposición testamentaria puede resultar válida para los bienes sitos en un país y nula para los que están en otro, así como un mismo heredero podría aceptar la herencia en un país y repudiarla en otro, en perjuicio de sus acreedores.[9] Sin embargo, el académico también reconoce que la aplicación de la ley del foro donde se encuentra el bien permite una liquidación y adquisición más rápida de la herencia. También ofrece mayor seguridad al crédito público y a los terceros que tengan intereses en los bienes,[10] pues la intervención de diversas autoridades públicas en el proceso de interpretación de la última voluntad del causante, conservación de la herencia yacente y adjudicación de bienes del caudal plantea problemas prácticos más allá de las normas del conflicto de leyes.[11]

Según explica Simó Santoja, la solución que se seleccione dependerá de la orientación de la doctrina y de la concepción jurídica sobre la sucesión en cada país.[12] Por eso, si "se concibe el patrimonio hereditario como una cosa que tiene una conexión estricta a los elementos personales,

---

[9] A. Miaja de la Muela, Derecho Internacional Privado II – Parte Especial, 9na ed., Madrid, Ed. Atlas, 1982, págs. 407-408.

[10] Íd. pág. 409.

[11] Íd. pág. 405.

[12] V.L Simó Santoja, Derecho sucesorio comparado, Madrid, Ed. Tecnos, 1968, págs. 169-177. No obstante, como señala Miaja de la Muela, "[l]a complejidad se acrecienta en Derecho Internacional Privado, al entrar en contacto ordenaciones sucesorias basadas en principios opuestos." Miaja de la Muela, op. cit., pág. 404.

es inevitable inclinarse a favor de la ley personal".[13] En ese sentido y partiendo de su concepción de la sucesión como una unidad, Simó Santoja indica que la sucesión debe considerarse, no como una serie de transmisiones de propiedades particulares, sino como la de un solo patrimonio que debe someterse a una sola ley. De esa forma se evitan distinciones en cuanto a los inmuebles que provocan dificultades prácticas para el pago de las deudas y el proceso de partición, además de "discriminaciones entre acreedores y herederos de una misma sucesión".[14]

Incluso los tratadistas de Estados Unidos, donde rige la doctrina germánica en el campo de las Sucesiones, entienden que es problemático contar con distintas masas sucesorales para los bienes muebles y los inmuebles de cada lugar, regidas por leyes diferentes que pueden llamar a interpretar un testamento de forma contradictoria. Así, se preguntan qué sería más importante: ¿tratar de manera uniforme los inmuebles de un lugar o tratar de manera uniforme los bienes de un caudal hereditario?[15]

En nuestro país, la profesora Martínez Moya considera que la segunda opción es la ideal, dado nuestro ordenamiento legal cuyas normas de Sucesiones están

---

[13] Simó Santoja, *op. cit.*, pág. 41.

[14] *Íd.*

[15] S.C. Symeonides, W. Collins Perdue y A.T. von Mehren, Conflict of Laws: American, Comparative, International, 2da ed., Minnesota, Ed. West, 2003, pág. 419.

diseñadas de acuerdo con la doctrina romana. Manifiesta
que:

> [E]n nuestra jurisdicción ahora mismo no están
> bien definidas las normas que aplicarían en
> controversias sucesorales de conflicto de leyes.
> Entendemos que nuestro Código pide a gritos una
> reforma, como resultado de la cual debe adoptarse
> un estatuto que incorpore el sistema romano
> universalista, que es el que está a tono con
> nuestra percepción del fenómeno sucesoral. El
> caudal hereditario debe verse como una masa
> única, independientemente de la naturaleza mueble
> o inmueble de los bienes y del lugar de su
> ubicación, a la que tendrá que aplicársele una
> sola ley, que podría ser la de la nacionalidad o
> la del domicilio del causante.[16]

Así lo disponía el Código Civil de Puerto Rico previo
a la reforma de 1902. La primera oración de su Artículo 10
era igual a la del Código vigente: "Los bienes muebles
están sujetos a la ley de la nación del propietario; los
bienes inmuebles a las leyes del país en que están sitos".[17]
Mas, luego añadía: "Sin embargo, las sucesiones legítimas y
las testamentarias, así respecto al orden de suceder como a
la cuantía de los derechos sucesorios y a la validez
intrínseca de sus disposiciones, se regularán por la ley
nacional de la persona de cuya sucesión se trate,
cualesquiera que sean la naturaleza de los bienes y el país
en que se encuentren". Esa excepción respecto a los casos
sucesorales, que hacía que tanto los bienes muebles como
los inmuebles que componían un caudal se dividieran bajo la
misma ley independientemente de donde ubicaran, se eliminó

---

[16] E. Martínez Moya, El Derecho Sucesorio Puertorriqueño, 67
Rev. Jur. U.P.R. 1, 88 (1998).

[17] Art. 10, Código Civil P.R., 31 L.P.R.A. sec. 10.

en 1902. Como explicó el caso de <u>Bracons v. Registrador de San Juan</u>, la Comisión Codificadora decidió uniformar la norma para que todos los derechos, incluyendo los hereditarios, se rigieran por el principio del derecho privado estadounidense de que los inmuebles se regularan por la ley del país en que están sitos.[18]

Cinco años después de la reforma, en <u>Hecht v. Hecht</u>, expresamos que, aunque a los inmuebles radicados en países extranjeros que formaban parte de la herencia se les tenían que aplicar las leyes del país en que estaban sitos, esos inmuebles se tenían que tomar en cuenta como integrantes de la masa total que dejó el difunto para efectos de la distribución del caudal hereditario.[19] Al mantener nuestra visión romana sobre las sucesiones, explicamos que "[e]l haber hereditario, sean cuales fueren los elementos que lo integran, constituye una sola masa y no puede liquidarse y partirse incluyendo en esas operaciones unos bienes y

_____

[18] <u>Bracons v. Registrador de San Juan</u>, 24 D.P.R. 753, 757 (1917). *Véanse también*: <u>Cabrer v. Registrador</u>, 113 D.P.R. 424, 434-435 (1982); <u>Colón v. El Registrador</u>, 22 D.P.R. 369, 372-373 (1915). En el Proyecto para la Codificación del Derecho Internacional Privado en Puerto Rico también se recomendó adoptar el principio de que los derechos reales sobre inmuebles localizados en Puerto Rico fueran gobernados por las leyes de Puerto Rico y los derechos reales sobre inmuebles ubicados fuera del país se rigieran por la ley que los tribunales del Estado donde están sitos aplicarían. Art. 26, Proyecto para la Codificación del Derecho Internacional Privado de Puerto Rico, Academia Puertorriqueña de Jurisprudencia y Legislación, marzo 1991. *Véase también* S.C. Symeonides, <u>A Sourcebook for the Codification of Puerto Rican Private International Law</u>, San Juan, Academia Puertorriqueña de Jurisprudencia y Legislación, págs. 2-24, 139-187.

[19] <u>Hecht v. Hecht</u>, 12 D.P.R. 227, 237-238 (1907).

excluyendo otros. Los derechos que sobre esa masa asistan a la demandante doña Margarita Hecht no pueden definirse y determinarse teniendo en cuenta únicamente los bienes hereditarios existentes en Puerto Rico, con exclusión de los que existan en el extranjero, pues se dividiría así la continencia [*sic*] del negocio con perjuicio de sus derechos".[20]

En Cabrer v. Registrador, en 1982, concebimos nuevamente el caudal del causante como una sola masa, independientemente de la localización de los bienes. Sin embargo, realizamos el análisis sobre preterición que requería el caso aplicando la ley del sitio de los inmuebles.[21] La profesora Martínez Moya opina que la metodología empleada en ese caso contraviene todas las doctrinas sobre el asunto y la contradicción en la jurisprudencia se debe a que nuestras normas internas sobre Sucesiones no coinciden con nuestras reglas de conflicto de leyes para el plano internacional. Señala que la legislación vigente en Puerto Rico presenta "una paradoja: su ordenamiento sucesoral interno configura la sucesión según el modelo romano y, sin embargo, su estatuto de conflicto de leyes es de corte germánico".[22]

---

[20] *Íd.* pág. 237.

[21] Cabrer v. Registrador, 113 D.P.R. 424 (1982).

[22] Martínez Moya, *Cabrer v. Registrador*, *supra*, págs. 559-561, 600-601.

Hoy, veinte años más tarde, nos enfrentamos nuevamente a la disyuntiva entre la corriente romana y la germánica.

II

Cada país tiene sus normas de conflicto de leyes, con las cuales determina si para resolver una controversia va a aplicar el ordenamiento nacional o el de otro Estado. Las directrices sobre conflicto de leyes suponen que el tribunal que está atendiendo el caso tiene jurisdicción para ello por su relación con las personas o la materia.[23] El proceso de identificar la ley aplicable no supone grandes dificultades, pues el ordenamiento jurídico de cada país dicta cuál debe utilizarse e incluye las excepciones de orden público.[24]

El problema puede suscitarse luego, cuando la sentencia de un país confiere o reconoce derechos que deben ser invocados en el extranjero. Es decir, cuando una nación

---

[23] El problema de conflicto de jurisdicciones es inusual y se da mayormente cuando existen acuerdos de competencia judicial internacional, mediante los cuales un Estado pacta con otro u otros que limitará la extensión de su jurisdicción en cierto tipo de situaciones. Estos acuerdos también incluyen cláusulas sobre reconocimiento y ejecución de sentencias. C. Esplugues Mota y J.L. Iglesias Buhigues, Derecho Internacional Privado, 5ta ed., Valencia, Ed. Tirant Lo Blanch, 2011, págs. 66-67.

[24] Las normas de conflicto de leyes no proveen la regla para resolver la controversia sino que dirigen al juzgador al ordenamiento jurídico en el que debe buscarla dependiendo de la situación presentada. Íd. págs. 209-216. Los autores brindan como ejemplo que, si el caso se está atendiendo en España y la norma de conflicto española señala que la sucesión se rige por la ley del país de nacionalidad del causante, el juzgador español aplicará el Derecho de ese país: el alemán si el causante es alemán, el peruano si el causante es peruano. Íd. pág. 211.

tiene que reconocer y aplicar, judicial o extrajudicialmente, lo resuelto en otro foro.[25] Pero, para esto, los ordenamientos proveen soluciones, como los procedimientos de reconocimiento de sentencias, entre los que se encuentra el *exequátur*.[26] Y es que, como indica el profesor dominicano Arias Núñez, los Estados reconocen que hay casos en que es necesario que se adjudiquen derechos más allá de sus fronteras y que el hecho de que el efecto de una decisión se extienda fuera del territorio nacional no contraviene el principio de que la facultad para ejecutar una sentencia la tiene el Estado donde se lleva a cabo esa acción. Por eso, siempre que se cumpla con las condiciones establecidas, los Estados cooperan entre sí para la ejecución de sentencias extranjeras en su tierra.[27] No obstante, si la norma de conflicto de leyes que rige en el país donde se lleva a cabo el procedimiento judicial ordena que se aplique la ley del lugar donde la decisión debe hacerse cumplir, se puede constatar desde el principio que la sentencia no contravenga el ordenamiento del otro foro. De ese modo, se facilita su ejecución.

La norma de *lex situs* o *lex rei sitae* es una regla de conflicto de leyes que se aplica cuando la decisión

---

[25] *Íd.* págs. 67-68.

[26] Sobre el *exequátur*, *véanse:* Regla 55 de Procedimiento Civil, 32 L.P.R.A. Ap. V; Rodríguez Contreras v. E.L.A., 183 D.P.R. 505 (2011).

[27] L. Arias Núñez, Manual de Derecho Internacional Privado, 5ta ed., Santo Domingo, 2010, pág. 355.

judicial que se emitirá tendrá efectos sobre bienes inmuebles. Esta regla, también conocida como el estatuto real, establece que los actos y contratos relativos a bienes inmuebles se rigen por las leyes del país en que éstos estén ubicados.[28] Por consiguiente, se debe utilizar la ley del sitio donde el inmueble se encuentra para resolver controversias relacionadas con ese bien.

En Estados Unidos, esta doctrina se ha mantenido por décadas y se fundamenta en que el Estado en el que se encuentra el inmueble tiene poder exclusivo para dictar las normas que lo regulan y tiene el interés más importante sobre lo que sucede con ese bien y con todas las propiedades ubicadas en su territorio. Además, al evitar que una misma tierra esté sujeta a diferentes ordenamientos legales, se le provee certeza a los dueños, seguridad a los compradores y claridad a los examinadores de título y registradores.[29] Por eso, las cortes e instituciones del lugar en que se encuentra la propiedad pueden negarse a

---

[28] Banco Popular v. Registrador, 172 D.P.R. 448, 454 (2007).

[29] Symeonides, Collins Perdue y von Mehren, *op. cit.*, págs. 38-40, 395, citando el tratado sobre conflicto de leyes de J.H. Beale. Los autores señalan que, a pesar de esto, hay ocasiones en que el *situs* no es el que más interés tiene; por ejemplo, en casos de Familia o Sucesiones, cuando todas las partes están domiciliadas en un lugar y la propiedad en controversia está en otro sitio, ¿qué pasa con los juicios valorativos encarnados en las leyes de la sociedad en la que viven las partes? Asimismo, pueden haber contradicciones cuando aplica tanto la norma de regir la propiedad por las leyes del sitio como la de interpretar un contrato según las leyes del lugar donde éste se hizo. *Íd.* págs. 39-40.

hacer valer un dictamen extranjero que no haya aplicado la ley del sitio.[30]

En el siglo 19, los tribunales estadounidenses comenzaron a utilizar la norma de *lex situs* con dos vertientes: una de conflicto de leyes y otra jurisdiccional. A base de la segunda, en todo tipo de controversia que involucrara derechos reales, determinaban que sólo el estado donde estuviera localizado el bien tendría jurisdicción para atender el caso.[31] Los problemas prácticos que generó esta doctrina -entre los que se encontraban el que las partes se vieran obligadas a litigar el mismo asunto en distintos estados- llevaron a los tribunales a buscar salidas a través de la jurisdicción sobre la persona y la teoría de que sólo se estaba ordenando transferir el título legal sobre la cosa (*conveyance*), con lo cual no se afectaba la propiedad directamente. Estas estrategias provocaron más confusión. Por ello, y dado que la doctrina del *lex situs* jurisdiccional no es un mandato obligatorio, su uso ha ido decayendo.[32]

---

[30] *Íd.* pág. 39. *Véase, además*, M.J. Whincop, Conflicts in the Cathedral: Towards a Theory of Property Rights in Private International Law, 50 U. Toronto L.J. 41 (2000).

[31] R. Alden, Modernizing the Situs Rule for Real Property Conflicts, 65 Tex. L. Rev. 585, 587-591 (1987).

[32] *Íd.* págs. 598-611, 621-633. *Véase* A.P. Dwyer, The Situs Rule, 4 Conn. Prob. L.J. 325 (1989). "As was suggested by Professor Russell Weintraub, many states as well as the District of Columbia and Puerto Rico favor the use of a less territorial, more interest-analysis approach to answer some conflicts of law questions". *Íd.* pág. 342.

La Opinión mayoritaria reconoce que la doctrina moderna se aleja de la norma rígida del *situs* y le da más importancia al análisis de los intereses de las partes, pero no lo toma en cuenta al resolver el caso.[33] Tampoco reconoce que no estamos obligados a aplicar la doctrina del *lex situs* jurisdiccional, pues ésta no es imperativa. Menos aún cuando ni siquiera en Estados Unidos, donde se desarrolló, la están siguiendo inflexiblemente.[34] Y mucho menos cuando en Puerto Rico nunca se ha utilizado la vertiente jurisdiccional de la norma de *lex situs*. Nuestra jurisprudencia demuestra que siempre hemos interpretado esta regla como una de conflicto de leyes.

En Colón v. El Registrador, resuelto en 1915, señalamos que había que aceptar, sin términos medios, la regla de *lex rei sitae*, en virtud de la cual no se puede "permitir que se verifique ninguna transacción relativa al

---

[33] Valencia Mercader v. Sandiford, Opinión del Tribunal, pág. 32.

[34] En los casos resueltos por el Tribunal Supremo de Estados Unidos en que se ha discutido este tema, es visible el problema del *lex situs* jurisdiccional y las incongruencias que resultan al seguir tratando de aplicar esa doctrina con múltiples excepciones. Por ejemplo, en Baker by Thomas v. General Motors Corp., 522 U.S. 222, 235-236 (1998), se dijo que un tribunal de un estado no puede transferir el título de un inmueble situado en otro estado, pero sí puede adjudicar los derechos y obligaciones de las partes respecto a ese bien y obligarlas a transferir el título sobre la propiedad. Asimismo, en Robertson v. Howard, 229 U.S. 254, 261 (1913), se determinó que la Corte de Quiebras en un estado tenía jurisdicción para ordenar la venta de una propiedad en otro estado porque el tipo de litigio le brindaba poder sobre todo el patrimonio del deudor así como sobre la persona del síndico, a quien le podía ordenar que hiciera la transferencia de título. De esta forma, se adjudica la propiedad sita en otro estado "indirectamente".

traspaso de cualquier derecho o título a la propiedad inmueble" que se encuentra en un Estado si con ello se infringen las leyes de ese Estado.[35] En ese caso, confirmamos la determinación del Registrador de la Propiedad de Puerto Rico de no dar paso a una cancelación de hipoteca porque en el proceso celebrado en España en el que se ordenó la cancelación no se cumplió con un requisito que imponía el Código Civil de Puerto Rico, que era donde estaba ubicado el inmueble.

En todos los casos relacionados con la doctrina de *lex situs* que este Tribunal ha atendido posteriormente, la pregunta ha sido si se le reconoce validez a un negocio realizado o un decreto dictado en otro país que afecta un inmueble sito en Puerto Rico y contraviene nuestro ordenamiento legal.[36] Esto es, se ha utilizado la norma de *lex situs* en su vertiente de conflicto de leyes, según los desarrollos del Derecho Internacional Privado. Recientemente, en Roselló Puig v. Rodríguez Cruz, este Tribunal expresó que el artículo 10 del Código Civil incorporó el principio de que las propiedades inmuebles se

---

[35] Colón v. El Registrador, *supra*, págs. 376-377 y 374, citando el tratado sobre conflicto de leyes de R.C. Minor.

[36] *Véanse:* Soto Hernández v. Registradora, 175 D.P.R. 575 (2009); Banco Popular v. Registrador, *supra*; Zarelli v. Registrador, 124 D.P.R. 543 (1989); Sucn. Evans v. Srio. de Hacienda, 108 D.P.R. 713 (1979); Pueblo v. Denis Rivera, 98 D.P.R. 704, 714 (1970); Martínez v. Vda. De Martínez, 88 D.P.R. 443 (1963); Armstrong v. Armstrong, 85 D.P.R. 404 (1962); Lókpez v. Sotelo, 70 D.P.R. 501 (1949); Babilonia v. Registrador, 62 D.P.R. 688 (1943); Rojas, Randall & Co. v. Registrador, 27 D.P.R. 21 (1919).

rigen por las leyes del lugar donde están sitas, con lo que se "evita que surjan conflictos entre estados hermanos <u>en relación con la ley que deba aplicarse respecto a las propiedades inmuebles</u> sitas en éstos".[37] Se indicaron las bondades de que un estado o territorio estadounidense aplique las leyes del estado en el que el inmueble en controversia está localizado y en momento alguno se mencionó la posibilidad de un problema de falta de jurisdicción.[38]

En el contexto sucesoral, en <u>Cabrer v. Registrador</u>, describimos como un principio harto conocido el que la transmisión de inmuebles sitos en Puerto Rico se rige por nuestras leyes y señalamos que los testamentos otorgados en el extranjero podían transmitir bienes inmuebles ubicados aquí siempre que no lo hicieran en modo que violara las leyes de Puerto Rico.[39] De esa forma, anunciamos que el principio de *lex rei sitae* aplica invariablemente si los bienes se encuentran en nuestro país o en el exterior; lo esencial es que el modo de transmisión de los inmuebles

---

[37] (Énfasis suplido.) <u>Roselló Puig v. Rodríguez Cruz</u>, 183 D.P.R. 81, 105 (2011).

[38] No se contempló que los tribunales de Puerto Rico no tuvieran jurisdicción para determinar a cuál de los ex cónyuges le pertenecía el bien inmueble sito en Florida que generó la disputa durante la división de bienes gananciales. De hecho, se adjudicó el título de la residencia, pues se concluyó que, dado que en Florida era válido el uso de un contrato para transmitir una propiedad conyugal, ésta "pasó a ser un bien privativo de la peticionaria" y sólo restaba determinar el crédito que debía recibir el esposo por su aportación. *Íd.* págs. 117-118.

ubicados en un Estado sea compatible con el ordenamiento legal de ese Estado.

En el caso ante nuestra consideración, se alega que varios inmuebles pertenecientes al caudal del causante puertorriqueño están sitos en República Dominicana. Por lo tanto, el tribunal de Puerto Rico que está atendiendo el caso de partición debe utilizar la ley dominicana al adjudicar esos bienes.[40] Nuestra doctrina de *lex rei sitae*

---

[39] <u>Cabrer v. Registrador</u>, *supra*, págs. 434-435.

[40] El estatuto real del Código Civil dominicano aplica la *lex situs* en su territorio: "Los bienes inmuebles, aunque sean poseídos por extranjeros, están regidos por la ley dominicana". Art. 3, Cód. Civ. Rep. Dom. La jurisprudencia dominicana ha interpretado que este artículo da una orden general; esto es, que los inmuebles extranjeros también se regirán por la ley del país en donde se encuentren. Arias Núñez, *op. cit.*, pág. 263. Sin embargo, en cuanto a las Sucesiones, "[l]a aplicación de la ley personal del causante a la sucesión es el principio jurídico que prevalece en el Derecho Internacional Privado dominicano. Esto garantiza que si el [causante] tiene bienes, muebles o inmuebles, en distintos países, se les aplique la misma ley a todos, porque, de no ser así y se le aplicara la ley de la situación, habría tantas leyes como bienes distribuidos en distintos países". J.M. Rosario, <u>Tratado de Derecho Internacional Privado</u>, Santo Domingo, Ed. Jurídicas Trajano Potentini, 2005, pág. 411. Esto sugiere que, en un caso como el presente, de verse la controversia sobre un inmueble del caudal ubicado en República Dominicana en ese país, pueda darse el reenvío; esto es, que, debido a que la ley del país donde está el bien hereditario ordena utilizar la ley personal del causante, termine el tribunal dominicano aplicando la ley de Puerto Rico. Por otro lado, el Código Bustamente de 1928 sobre Derecho Internacional Privado en América, del cual República Dominicana es signataria pero Estados Unidos no, establece que "en los juicios de testamentaría o ab intestato será juez competente el del lugar en que tuvo el finado su último domicilio" para solucionar conflictos de leyes. Art. 327, Código Bustamante. Asimismo, el Código Civil dominicano señala que "[l]a acción de partición y las cuestiones litigiosas que se susciten en el curso de las operaciones se someterán al tribunal del lugar en que esté abierta la sucesión". Art. 822, Cód. Civ. Rep. Dom. Véanse también los

no priva de jurisdicción a nuestros tribunales; sólo define la ley que éstos deben emplear, ya sea la propia o la foránea.

## III

La determinación de la ley aplicable se ha utilizado como un factor útil para decidir cuál es el foro más adecuado para atender un litigio. No se trata de qué tribunal tiene jurisdicción, sino de en cuál de los que tienen jurisdicción es más práctico que se vea el caso. Por esto, los peticionarios recurrieron a la doctrina del *forum non conveniens* en su alegato ante este Tribunal.[41] Esta doctrina, procedente del *common law*, fue incorporada a nuestro ordenamiento hace tres años, en Ramírez Sainz v. Cabanillas.[42]

---

artículos 718-892 del Código Civil dominicano, sobre su regulación de las sucesiones.

[41] En la práctica, una parte presenta una moción de desestimación basada en la doctrina de *forum non conveniens* y, si logra probar que el foro es claramente inapropiado para atender la controversia y existe otro más idóneo, se desestima el caso para que sea presentado en otro foro. En el presente pleito, la parte recurrida no ha presentado este tipo de moción, pero ambas partes han discutido por qué la controversia se debe atender en Puerto Rico o en República Dominicana, aludiendo a los criterios de *forum non conveniens*. Además, la Opinión mayoritaria descarta la doctrina de *forum non conveniens* a raíz de su conclusión de que Puerto Rico no tiene jurisdicción sobre la materia. Discuto la doctrina con el fin de aclarar que sí sería aplicable en este caso, ya que la norma de *lex situs* no priva a Puerto Rico de jurisdicción, y utilizo los criterios que la rigen de forma ilustrativa.

[42] Ramírez Sainz v. Cabanillas, 177 D.P.R. 1 (2009). En ese caso, utilizamos la doctrina para determinar cuál era el foro más apropiado para atender una controversia contractual entre un abogado dominicano y un ciudadano puertorriqueño relacionada con un bien inmueble sito en República Dominicana. Resolvimos que Puerto Rico era un

El análisis de *forum non conveniens* permite que, cuando foros alternativos tienen jurisdicción, el tribunal que tiene la relación más significativa con el caso sea el que lo resuelva, con el fin de reducir los costos, la complejidad y la duración de los procedimientos. Así, para favorecer a las partes, un tribunal puede rehusar ejercer su jurisdicción en circunstancias excepcionales, cuando una parte se lo solicita y prueba que el otro foro con jurisdicción es claramente el más apropiado. En un caso en el que el tribunal de Puerto Rico determine que otro país o estado es el más apropiado para atender la controversia, debe desestimar la demanda o paralizar los procedimientos hasta que el otro foro resuelva la controversia particular dentro del caso sobre la cual ese otro foro tiene mayor interés o relación. Por el contrario, cuando el tribunal de Puerto Rico concluya que el nuestro es el foro más adecuado, debe establecer conforme a qué normas va a resolver el caso, esto es, cuál es la ley aplicable.[43]

---

foro más conveniente que República Dominicana tras considerar que el litigio llevaba 10 años pendiente en Puerto Rico, la evidencia procedente de la isla vecina se había legalizado para presentarse aquí y los bienes disponibles para la ejecución de la sentencia se encontraban en Puerto Rico. *Véase también* <u>Bonet Cardona v. Holahan</u>, 181 D.P.R. 582, 599-602 (2011).

[43] *Íd.* págs. 13-14, 31-38 (2009). Para esta determinación, se considera la excepción reconocida en el Derecho Internacional Público de no aplicar las normas extranjeras cuando éstas violan el orden público local, aunque una disposición de conflicto de leyes indique que corresponde aplicar la ley extranjera.

Para decidir cuál es el foro más apropiado, se consideran factores como: si es conveniente para las partes litigar en ese lugar, la localización de las fuentes de prueba y los mecanismos para obtenerla, términos prescriptivos aplicables, si es el momento oportuno para paralizar el pleito, el reconocimiento de sentencias en otros foros y la posibilidad de ejecución de sentencia.[44] En algunas ocasiones, también se toma en cuenta el estatuto de conflicto de leyes aplicable como consideración práctica, pues resulta más cómodo que una disposición legal sea interpretada por los juzgadores que están acostumbrados a estudiarla.[45] No obstante, ninguno de los criterios es determinante y su peso depende de las circunstancias del caso.[46]

---

[44] *Íd.* págs. 38-40. *Véase*, además, en general, R.A. Brand y S.R. Jablonski, Forum Non Conveniens; History, Global Practice, and Future Under the Hague Convention on Choice of Court Agreements, New York, Oxford University Press, 2007.

[45] M. Karayanni, *Forum Non Conveniens* in the Modern Age, New York, Transnational Publishers, 2004, págs. 205-209.

[46] Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981). En este caso, el Tribunal Supremo de Estados Unidos indicó que, para determinar cuál es el foro más conveniente, no se debe utilizar el criterio de cuál es el foro más favorable para el demandante de acuerdo con la norma de conflicto de leyes aplicable en cada uno. "In fact, if conclusive or substantial weight were given to the possibility of a change in law, the *forum non conveniens* doctrine would become virtually useless. Jurisdiction and venue requirements are often easily satisfied. As a result, many plaintiffs are able to choose from among several forums. Ordinarily, these plaintiffs will select that forum whose choice-of-law rules are most advantageous. Thus, if the possibility of an unfavorable change in substantive law is given substantial weight in the *forum non conveniens* inquiry, dismissal would rarely be proper. […] If the

No hay duda de que, como bien señala la parte peticionaria, Puerto Rico es el foro más apropiado para atender las controversias relacionadas con el caudal hereditario del señor Valencia Jiménez.[47] Nuestra jurisdicción tiene una relación más significativa con el caso pues éste trata de problemas sobre los bienes que, mediante un testamento otorgado en Puerto Rico, dejó una persona que residía y falleció en Puerto Rico.[48] Además, la mayor parte de los bienes del caudal se encuentra en Puerto Rico y la acción fue instada en este país. Asimismo, llama la atención que el caso se está atendiendo en los tribunales puertorriqueños hace más de 10 años y se ha llevado a cabo un descubrimiento de prueba amplio, por lo que no es el momento oportuno para trasladar controversias del caso a otro foro. Cabe destacar también que no existe acción judicial alguna sobre las propiedades en litigio ante los tribunales de República Dominicana, contrario a lo que sucedía en el caso de Hecht v. Hecht, en el que el Tribunal tomó en consideración que ya se había iniciado un

---

possibility of a change in law were given substantial weight, deciding motions to dismiss on the ground of *forum non conveniens* would become quite difficult. Choice-of-law analysis would become extremely important, and the courts would frequently be required to interpret the law of foreign jurisdictions." *Íd.* págs. 250-251.

[47] Solicitud de Certiorari, CC-2010-1002, págs. 14-15.

[48] En el presente caso, la relación del causante con la República Dominicana consiste en que éste tenía subsidiarias de su negocio en ese país.

pleito de división de bienes en otro tribunal con jurisdicción, la corte civil de Ginebra.[49]

Entonces, de presentarse una petición de *forum non conveniens*, nuestro foro no debe rehusar ejercer jurisdicción en este caso. Aunque tanto Puerto Rico como República Dominicana tienen jurisdicción sobre los bienes inmuebles en controversia, resulta más apropiado que Puerto Rico atienda la situación relacionada con los bienes dominicanos dentro del pleito sucesoral puertorriqueño. Claro está, los tribunales locales deberán aplicar las normas dominicanas a los bienes inmuebles sitos en la isla vecina, según dispone el Artículo 10 de nuestro Código Civil.

IV

No es correcta la conclusión de la Opinión mayoritaria de que los tribunales de Puerto Rico no tienen autoridad para atender acciones de titularidad de inmuebles que un causante puertorriqueño deje en otro país. Pero aun si ese no fuera el fundamento para el procedimiento que formula, no puedo estar de acuerdo con su propuesta.

Según la Opinión, cuando un causante domiciliado en Puerto Rico deje inmuebles en el extranjero, se abrirá una

---

[49] En Hecht v. Hecht, el Tribunal decidió que, para la adjudicación de la herencia en Puerto Rico, se considerarían todos los bienes del caudal, aunque a los inmuebles ubicados en países extranjeros se les aplicarían las leyes de esos Estados y no se intervendría con las adjudicaciones que hubiesen hecho ya los tribunales de Suiza, donde había residido el causante y estaba pendiente otro pleito sobre bienes del caudal.

masa sucesoral por cada país donde haya este tipo de bienes y las partes deberán acudir a los tribunales de cada uno de esos lugares para que emitan dictámenes sobre la titularidad de los inmuebles. Luego, acudirán al tribunal en Puerto Rico para que se tome conocimiento judicial de cada una de esas sentencias y deberán presentar prueba sobre el valor de los inmuebles adjudicados en el extranjero. Entonces, el tribunal de Puerto Rico deberá computar el valor de esos inmuebles en el caudal hereditario para tomarlos en cuenta en el proceso de partición y hacer los ajustes necesarios en la distribución de bienes.[50]

Con ese último paso, la Opinión persigue una solución coherente con nuestro ordenamiento sucesoral y más justa para todas las partes, por lo que me parece acertada su adopción como norma general.[51] Esto a pesar de que no

---

[50] Valencia Mercader v. Sandiford, Opinión del Tribunal, págs. 41-44.

[51] En otros países, se han acogido normas similares para adaptar el resultado de la aplicación de las normas de conflicto de leyes al ordenamiento nacional en el área de Sucesiones y evitar injusticias entre herederos. Por ejemplo, en Francia existe la figura del *prélevement*, mediante la cual a los herederos beneficiados por la división hecha a base de una ley extranjera se les descuenta del total de bienes sometidos a la ley francesa lo que se les adjudica en la otra nación, con el fin de proteger los derechos reconocidos por la ley francesa de quienes se ven perjudicados por la aplicación de la ley extranjera. *Véase* Martínez Moya, *Cabrer v. Registrador*, *supra*, págs. 591-594, 601-602. También existe el principio de elección inglés, que dicta que los herederos que resulten beneficiados por la ley del sitio de los inmuebles en el extranjero accedan a compensar a los demás herederos por el valor de éstos al momento de partir los bienes regidos por la ley inglesa. *Íd.* pág. 590.

siempre será posible dividir los bienes según dictan nuestras normas para que la distribución sea más equitativa, pues no necesariamente habrán bienes suficientes en el caudal en Puerto Rico para compensar a un heredero por lo que otro heredero recibió por encima de su cuota debido a la aplicación de una ley extranjera a un inmueble de la masa hereditaria ubicado fuera de nuestro país.

Con lo que no estoy de acuerdo es con obligar a las partes a instar pleitos de partición independientes en cada foro en que el causante tuviera bienes inmuebles. Ello representa un procedimiento más largo, más complejo y más costoso. Si lo que se busca es que la adjudicación de la titularidad del bien sea eficaz en el país donde la sentencia se va a ejecutar -por ejemplo, en el Registro de la Propiedad donde se va a inscribir el inmueble-, nuestra norma de conflicto de leyes propende a ello al dictar que se aplique al inmueble la ley del lugar donde éste se encuentra.[52]

El procedimiento diseñado en la Opinión mayoritaria, además de poco conveniente, es innecesario. Reitero que los tribunales de Puerto Rico tienen jurisdicción para distribuir los bienes inmuebles sitos en otras jurisdicciones que forman parte del conjunto de bienes que

---

[52] El hecho de que un tribunal de Puerto Rico esté atendiendo el caso no impide que se puedan solicitar certificaciones sobre el estatus del inmueble o las leyes aplicables al foro en el que se encuentra el bien. *Véanse:*

se tiene que dividir en un caso que está atendiendo nuestro foro. Nuestra norma de *lex situs* solamente indica cuál ordenamiento legal deberá aplicar el juzgador de Puerto Rico a esos inmuebles. Los tribunales de primera instancia aplican las leyes de otras jurisdicciones constantemente, tanto en casos de Sucesiones como de otras materias. Aunque este proceso no está exento de dificultades, pues requiere que las partes coloquen al tribunal en condición de emplear el Derecho extranjero y que el juzgador local se esfuerce para aplicar correctamente normas con las que probablemente no está familiarizado, es más viable que presentar pleitos en diversos países y esperar que todos ellos se resuelvan para proceder a la partición.

V

Como ya he expresado, al igual que la Opinión mayoritaria, confirmaría la Sentencia del foro apelativo en cuanto a la controversia relacionada con el descubrimiento y la presentación de prueba.

Sin embargo, no puedo aceptar el dictamen mayoritario que priva de jurisdicción a los tribunales de Puerto Rico para adjudicar sobre los inmuebles pertenecientes al caudal hereditario situados en el extranjero. Contrario a lo que afirma la Opinión mayoritaria, la doctrina de *lex situs* no priva de jurisdicción a nuestro foro en este caso, pues esa doctrina no tiene que ver con jurisdicción, sino solamente con cuál será la ley aplicable. Además, no sólo se equivoca

---

Esplugues Mota e Iglesias Buhigues, *op. cit.*, págs. 226-

la Opinión en su razonamiento jurídico, sino que con ello instituye un proceso oneroso e inefectivo en extremo para las partes. Por todo ello, respetuosamente disiento.


Liana Fiol Matta
Jueza Asociada

---

251; Rosario, *op. cit.*, págs. 434-441.